Howard **REISMAN**, Amalia Reisman, Galite Reisman, Kenneth Reisman, Talia Reisman, and Amgata Holdings, Ltd., Plaintiffs,

v.

## KPMG PEAT MARWICK LLP, Defendant.

### Civ. A. No. 96–10521–WGY.

United States District Court,
D. Massachusetts.

Feb. 28, 1997.

---

Alexander T. Bok, Edward T. Dangel, III, Dangel, Donlan & Fine, Boston, MA, for Howard Reisman, Amalia Reisman, Galite Reisman, Kenneth Reisman, Talia Reisman, Amgata Holdings Ltd.

Arnold P. Messing, Joseph H. Zwicker, Andrea L. Crowley, Choate, Hall & Stewart, Boston, MA, for KPMG Peat Marwick, LLP.

## MEMORANDUM AND DECISION

YOUNG, District Judge.

### I. Introduction

The plaintiffs Howard, Amalia, Galite, Kenneth, and Talia Reisman (the "Reismans"), and a related company, Amgata Holdings Ltd.[1] ("Amgata," collectively "the plaintiffs") come before this Court having sued the local office of an international public accounting firm, KPMG Peat Marwick LLP ("Peat Marwick"). In their Complaint,[2] the plaintiffs allege that Peat Marwick violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 (Count I), and engaged in unfair and deceptive trade practices under Mass.Gen.L. ch. 93A (Count II),

---

1. Although the Complaint does not specify the exact nature of the relationship between Amgata and the Reismans, this Court infers that Amgata is a holding company controlled by the Reismans. In any event, the distinction is immaterial to the resolution of this motion to dismiss. Since the Complaint refers to these two parties as "the plaintiffs," this opinion shall do so as well.

2. The Complaint was filed on March 11, 1996 and amended on June 18, 1996.

common law fraud (Count III), and negligent misrepresentation (Count IV). The plaintiffs contend that they lost $14,000,000 in the sale of their company, Varnet Software Corporation ("Varnet"), to Marcam Corporation ("Marcam"), a company whose financial records were audited by Peat Marwick. The plaintiffs claim that Peat Marwick is liable to them because, in its role as Marcam's accountant, Peat Marwick played a "central role in the issuance of fraudulent and misleading financial statements from 1991 to 1993." Complaint ("Compl.") at 1.[3]

Peat Marwick has moved to dismiss the complaint, asserting, *inter alia*, that the plaintiffs' claims are time-barred; that the plaintiffs have failed to state a claim upon which relief may be granted, and that the plaintiffs have failed to plead their allegations of fraud with particularity.

## II. Statement of Facts

In ruling on a motion to dismiss, this Court must take the material facts as alleged in the Complaint as true and view them in the light most favorable to the plaintiffs. *Deren v. Digital Equip. Corp.*, 61 F.3d 1, 1 (1st Cir. 1995). Although the Complaint is factually complex, the story can be distilled to its essence as follows:[4] Marcam, based in Massachusetts, is a publicly traded company specializing in the supply of application software products for business planning and control. Its securities are traded on the NASDAQ Stock Exchange. At all times relevant to this lawsuit, Peat Marwick served as the accounting firm responsible for preparing Marcam's financial statements. According to financial statements produced by Peat Marwick, between 1987 and 1990 Marcam's reported revenue increased from $5,500,000 to $28,500,000. The company's net income simi-

larly increased from a loss of $1,440,000 in 1987 to a gain of $4,230,000 in 1990. The three specific transactions which give rise to the plaintiffs' claims against Peat Marwick involve 1) accounting treatment of Marcam's acquisition of certain European distributorships, 2) accounting treatment of Marcam's purchase of MAPICS software, and 3) Marcam's purchase of Varnet, the plaintiffs' company.

### A. The European Subsidiaries

In 1991, Marcam decided to expand its product line and began to acquire companies offering products which complemented Marcam's core business. That same year, in order to increase its European revenues, Marcam invested in and took control of its European distributors in Italy, Belgium, and the Netherlands. The plaintiffs allege that although "Marcam financed, controlled, and operated these European distributors as its subsidiaries,"[5] Peat Marwick "knowingly falsely reported that these [European] distributors were not subsidiaries," Compl. ¶ 17, and failed to include the sales and net losses of the European distributors in Marcam's financial statements, as required by Accounting Principles Board Statement 4 and Rule 3A–02 of SEC Regulation S–X. Had the financial operations of the European distributors been set forth properly, the plaintiffs claim that Marcam's financial statements would have reflected a net loss instead of a profit for the fiscal years 1991 through 1993.

In the October 1993 Form 10–K releasing Marcam's fiscal 1993 results, Peat Marwick for the first time consolidated the losses suffered by two of the European distributors. In 1994, when Peat Marwick issued revised financial statements for Marcam showing

---

**3.** This case is factually quite similar to a 1994 class action commenced in this Court against Marcam and three of its officers and directors alleging, *inter alia*, securities fraud in violation of Section 10(b) and Rule 10b–5. *See Abato v. Marcam Corp.*, 162 F.R.D. 8, 10–11 (D.Mass. 1995) (granting defendant's motion to dismiss because alleged fraud did not constitute a common course of conduct for the purposes of securities fraud class action requirement). In fact, this case appears to be a repackaging of the *Abato* class' allegations against Marcam with a different party, the auditors, substituted as defen-

dant. The plaintiffs are not members of the *Abato* class. The parties in *Abato* settled the case on July 29, 1996.

**4.** For a more detailed exposition of the facts underlying the Marcam transactions, see *Abato v. Marcam*, 162 F.R.D. at 9–10.

**5.** The Plaintiffs do not specify how Marcam financed, controlled, and operated the European distributorships as its subsidiaries.

losses for the fiscal year 1991–1993 period, the changes to the statements were explained as restatements rather than as charges to earnings. The result of this characterization was that Marcam's reported fiscal 1993 net income of $2,550,000 was inflated by $5,600,000 due to the alleged fraudulent reporting of the European subsidiaries. Had the losses of the European subsidiaries been accurately reported, the plaintiffs allege that Marcam's stock would have traded at a lower price.

## B. *The MAPICS Software*

In late 1992, Marcam announced that it would purchase the worldwide rights to IBM's MAPICS software for 1,600,000 shares of Marcam common stock. The plaintiffs claim that Peat Marwick acted fraudulently by reporting the MAPICS transaction so as to avoid reporting substantial losses for each quarter during 1993. Peat Marwick allegedly reported that Marcam was only acquiring "the exclusive worldwide marketing rights" to the MAPICS product line, rather than the MAPICS software itself. Based on this allegedly false characterization, Peat Marwick utilized a highly favorable accounting treatment to inflate Marcam's fiscal 1993 results, recording 100% of the $15,-600,000 initial cost of the license as an asset on its balance sheet. The plaintiffs allege that, under Generally Accepted Accounting Principles, Peat Marwick should have caused Marcam's financial statements to reflect an expense of $5,500,000 for the MAPICS purchase price in the second quarter of 1993. Had the MAPICS transaction been properly recorded, the plaintiffs allege that Marcam's second quarter 1993 earnings would have been greatly reduced, with a similar negative effect upon Marcam's stock valuation. As with the European distributors, when Peat Marwick issued revised financial statements for the fiscal year 1991 through 1993 period, it explained the changes as restatements rather than as charges to earnings. The result of the mischaracterization of the MAPICS transaction, the plaintiffs aver, was that

Marcam's reported fiscal 1993 net income of $2,550,000 was inflated by $9,000,000.

## C. *The Varnet Transaction*

In early 1993, the plaintiffs entered into negotiations to sell their company, Varnet, to Marcam. Following discussions between the principals of the two companies, Marcam valued the price of all the shares of Varnet at approximately $23 million. On May 17, 1993, after reviewing and relying upon Marcam's 1991, 1992, and first quarter 1993 financial reports issued by Peat Marwick, the plaintiffs signed a letter of intent to exchange their shares in Varnet for $23 million worth of Marcam's restricted stock. One month later, after reviewing Marcam's second quarter 10–Q report, filed in May, 1993, the plaintiffs completed the stock swap transaction with Marcam, receiving 885,000 restricted shares of Marcam in consideration for the shares in Varnet and the execution of various employment and non-competition agreements. In addition to preparing and supplying Marcam's financial statements to the plaintiffs, Peat Marwick structured the MAPICS and Varnet transactions, including the issuance of an opinion letter on pooling without which, allege the plaintiffs, the Varnet transaction would not have been consummated. Finally, late in 1993, the plaintiffs sold all of their shares in Marcam and executed a general release absolving Marcam from liabilities of all sorts.[6] Following the sale and release, the plaintiffs state that they neither received nor reviewed the subsequent SEC filings or other information relating to Marcam or to Peat Marwick. The Reismans allege that they were unaware of any wrongdoing by Peat Marwick until May, 1995.

The stock swap transaction had a four month escrow period, and the plaintiffs had to wait an additional month to obtain and register their Marcam stock. Upon finally acquiring stock in Marcam, the plaintiffs learned that between June, 1993, when they consummated the stock swap transaction with Marcam, and December, 1993, when they eventually sold their holdings in Marcam, Marcam's stock had dropped sixteen

---

6. On December 21, 1993, the plaintiffs paid Marcam $730,000 to settle a claim for indemnification filed by Marcam against the plaintiffs arising from the sale of Varnet. *See* Peat Marwick's Memorandum in Support of its Motion to Dismiss ("Peat Marwick's Mem.") at 3 n. 2.

points from the price at the time of exchange to its alleged "true" value. The plaintiffs contend that they lost $14,000,000 as a direct result of Peat Marwick's false statements. Had Marcam's true financial position been accurately and honestly reported by Peat Marwick, the plaintiffs aver that the 1991, 1992, and 1993 statements would have demonstrated that Marcam was in poor financial condition, having lost money over the two and one half years prior to the stock swap transaction for Varnet. The plaintiffs state that they would never have exchanged Varnet's stock for Marcam's stock had they known of Marcam's perilous financial state.

### III. Standard of Review

A motion to dismiss tests the legal sufficiency of the complaint, not the plaintiff's likelihood of ultimate success. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In assessing a motion to dismiss, the Court must take all allegations contained in the complaint as true and must draw all inferences in favor of the plaintiffs. *Deren,* 61 F.3d at 1; *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (citations omitted).

"The crucial inquiry on a motion to dismiss is whether, based on the allegations of the complaint at issue, the plaintiff is entitled to offer evidence in support of [the] claims." *Siniscalchi v. Shop–Rite Supermarkets, Inc.,* 903 F.Supp. 182, 186 (D.Mass.1995) (citing *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686). "[I]f under any theory, the allegations of the complaint are sufficient to state a cause of action in accordance with the law [the court] must deny a motion to dismiss." *Vartanian v. Monsanto Co.,* 14 F.3d 697, 700 (1st Cir. 1994) (citing *Knight v. Mills,* 836 F.2d 659, 664 (1st Cir.1987)).

### IV. Discussion

#### A. *Count I: Section 10(b) and Rule 10b–5 Violations*

Peat Marwick contends that the plaintiffs' Section 10(b) and Rule 10b–5 claims are time-barred. "Litigation instituted pursuant to § 10(b) [of the Securities and Exchange Act of 1934] and [Securities Exchange Commission] Rule 10b–5 [ ] must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364 & n. 9, 111 S.Ct. 2773, 2782 & n. 9 , 115 L.Ed.2d 321 (1991) (holding that the one-year statute of limitations and accompanying three-year period of repose contained in Section 9[e] of the 1934 Act, codified at 15 U.S.C. § 78i[e], govern claims brought under Section 10[b] and Rule 10b–5).

As to the one-year statute of limitations, the plaintiffs argue that their claims are not time-barred because they did not have actual notice of the violations by Peat Marwick until May 1, 1995, less than a year before they filed suit. Plaintiffs' Memorandum in Opposition to Motion to Dismiss ("Plaintiffs' Mem.") at 19. Actual notice, however, is not the appropriate standard for determining when the statute of limitations begins to run for a 10b–5 claim. Every circuit court of appeals that has addressed the issue has interpreted *Lampf* to require only "inquiry" or "constructive notice." *In re Stac Elec. Securities Litigation,* 89 F.3d 1399, 1411 (9th Cir.1996); *Olcott v. Delaware Flood Co.,* 76 F.3d 1538, 1549 (10th Cir.1996) (interpreting and applying Third Circuit law); *Whirlpool Fin. Corp. v. GN Holdings Inc.,* 67 F.3d 605, 609 (7th Cir.1995) (citing *Tregenza v. Great Am. Communications Co.,* 12 F.3d 717, 722 (7th Cir.1993)); *Menowitz v. Brown,* 991 F.2d 36, 41 (2d Cir.1993); *Howard v. Haddad,* 962 F.2d 328, 330 (4th Cir.1992) (citing *Davis v. A.G. Edwards & Sons, Inc.,* 823 F.2d 105, 107 (5th Cir.1987)). The First Circuit had explicitly adopted the doctrine of inquiry notice in Rule 10b–5 actions, *Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123, 128 (1st Cir.1987), but it has not applied the doctrine since the *Lampf* decision in 1991. Post–*Lampf* decisions of district courts within this Circuit, however, have held that inquiry notice remains the proper standard. *See*

*Manchester Mfg. Acquisitions v. Sears Roebuck & Co.*, 909 F.Supp. 47, 50 (D.N.H.1995) ("The court herewith ... rules that the level of notice mandated by the Supreme Court in *Lampf* is inquiry, or constructive, notice."); *Allied Inv. Corp. v. KPMG Peat Marwick*, 872 F.Supp. 1076, 1081 (D.Me.1995) ("inquiry notice is the proper standard to be applied in the wake of the *Lampf* decision and its progeny").[7] Thus, the plaintiff's 10b–5 claims shall be tested against an inquiry notice standard.

■ Under the doctrine of inquiry notice, the statute of limitations for a 10b–5 claim begins to run from the time when, in the exercise of reasonable diligence, an investor "should have discovered the alleged fraud." *Maggio*, 824 F.2d at 128 (citing *General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d 8, 11 (1st Cir.1986)). The First Circuit has observed that " 'storm warnings' of the possibility of fraud trigger a plaintiff's duty to investigate in a reasonably diligent manner." *Maggio*, 824 F.2d at 128 (citing *Cook v. Avien*, 573 F.2d 685, 697 (1st Cir.1978)). " 'Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.' " *Allied Inv. Corp.*, 872 F.Supp. at 1081 (quoting *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st Cir.1987)).

■ Viewing the factual allegations set forth in the Complaint in the light most favorable to the plaintiffs, this Court holds that the plaintiffs were on inquiry notice as early as October 1993, when Peat Marwick filed a Form 10–K on Marcam's behalf disclosing the problems with Marcam's prior financial statements, and certainly no later than December 21, 1993, when plaintiffs sold all of their shares in Marcam. Consider the context of the stock swap transaction: The Reismans sold their entire company, held by the family for 20 years, to Marcam for 885,000 shares of its stock. Certainly, as Marcam's share price dropped between June and November, 1993, storm clouds must have gathered on the horizon while the Reismans waited for their shares to vest. Since the Reismans allege throughout their pleadings that Peat Marwick's reporting on Marcam's financial statements was material to their decision to sell Varnet, they ought have been somewhat concerned in October, 1993, when Peat Marwick prepared financial statements that for the first time included the losses of the European distributors in Marcam's bottom line. The Form 10–K filed in October, 1993, was the first sprinkle of rain that should have "triggered [the Reisman's] duty to investigate in a reasonably diligent manner." *Maggio*, 824 F.2d at 128. If the storm clouds gathering during the summer and fall of 1993 did not create concern, or the raindrops in October, 1993, then the Reismans most certainly were caught in the open in December, 1993, when the share price was so low that their holdings of 885,000 shares of Marcam stock—valued at $23,000,000 in June—were in December worth only $9,000,000, some $14,000,000 less than at the time of the stock swap six months earlier.[8] Accordingly, all of the plaintiffs' claims under Section 10(b) and Rule 10b–5 are barred by the

---

**7.** The plaintiffs point to two cases from this district which contain language suggesting that actual notice is the proper standard under *Lampf*. See *Slavin v. Morgan Stanley & Co.*, 791 F.Supp. 327, 331–32 (D.Mass.1992); *Greenfield v. Shuck*, 856 F.Supp. 705, 708 (D.Mass.1994). Both of these decisions, however, applied the two-year statute of limitations followed by federal courts prior to *Lampf*, and did not directly address the question of whether the *Lampf* one-year limitations period commences upon inquiry notice. *Slavin*, 791 F.Supp. at 332; *Greenfield*, 856 F.Supp. at 709.

In *Greenfield*, this Court wrote "the proclaimed period of limitation [in *Lampf*] is one year from actual discovery of the fraud." *Id.* at 708. This phraseology in *Greenfield* was mere *obiter dicta* and irrelevant to determining the legal issues in that case. Recognizing the wealth of legal precedent on the issue, this Court apologizes for its imprecision and applies the inquiry notice standard, consistent with courts within and without this Circuit. After all, "foolish consistency is the hobgoblin of little minds." Ralph W. Emerson, *Self–Reliance*, in *The Best of Ralph Waldo Emerson* 119, 127 (1941).

**8.** In addition, in August 1994, Peat Marwick issued revised financial statements for Marcam showing losses for the 1991–1993 period, thus drenching the plaintiffs with the information that the prior statements were not accurate. Although by that time the plaintiffs no longer held any stock in Marcam, the Form 10–K issued in October 1993—while the plaintiffs were still stockholders—should have alerted the plaintiffs to monitor Marcam's subsequent filings.

one-year statute of limitations, and are hereby dismissed *with prejudice.*

### B. *Count III: Common Law Fraud Claim*

■ Peat Marwick asserts that the plaintiffs have failed to plead the elements of fraud with particularity as required by Federal Rule of Civil Procedure 9(b),[9] and that, in any event, the plaintiffs' fraud claim is barred by the three-year general Massachusetts tort statute of limitations. *See* Mass. Gen. L. ch. 260 § 2A.

■ Under Massachusetts law, to establish a cause of action for fraud or deceit, a plaintiff must show " 'that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing [the plaintiff] to act thereon, and that [the plaintiff] relied upon the representation as true and acted upon it to his damage.' " *Danca v. Taunton Sav. Bank,* 385 Mass. 1, 8, 429 N.E.2d 1129 (1982) (quoting *Barrett Assocs. v. Aronson,* 346 Mass. 150, 152, 190 N.E.2d 867 (1963)); *see also Metropolitan Life Ins. Co. v. Ditmore,* 729 F.2d 1, 4 (1st Cir.1984). "[T]he proof of scienter in fraud cases is often a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983). "It is well settled," however, "that Rule 9(b) requires the plaintiff . . . to specify the time, place and content of an alleged false representation." *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir. 1991). "Although a plaintiff need not specify the circumstances or the evidence from which fraudulent intent could be inferred, the complaint must provide some factual support for the allegations of fraud." *Id.*[10]

■ The mere allegation that an auditor violated certain accounting standards does not give rise to an inference of scienter. *In re Software Toolworks Inc.,* 50 F.3d 615, 627 (9th Cir.1994) (quoting *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir. 1994)) ("failure to follow [Generally Accepted Accounting Practices], without more, does not establish scienter"), *cert. denied,* —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995); *Melder v. Morris,* 27 F.3d 1097, 1103 (5th Cir.1994) ("[B]oilerplate averments that the accountants violated particular accounting standards are not, without more, sufficient to support inferences of fraud"); *see also Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1019 (5th Cir.1996). In this case, however, the plaintiffs have done more than simply assert that Peat Marwick failed to comply with Generally Accepted Accounting Principles when reporting on Marcam. The complaint sets forth specific factual allegations which, if proven, would permit a reasonable factfinder to conclude that Peat Marwick made false representations of material fact with knowledge of their falsity when reporting on Marcam. *See Greenstone v. Cambex,* 975 F.2d 22, 25 (1st Cir.1992). First, the plaintiffs allege that despite the fact that Marcam financed, controlled, and operated the European distributors as subsidiaries, Peat Marwick falsely reported that these distributors were not subsidiaries. Compl. ¶ 17. Second, the plaintiffs allege that in 1992, Marcam publicly announced its intention to purchase the worldwide rights to IBM's MAPICS software, and did in fact purchase such software, but that Peat Marwick nevertheless reported that Marcam acquired only the "exclusive worldwide marketing rights." Compl. ¶ 24. Accordingly, this Court holds that the plaintiffs have pleaded

**9.** Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b).

Peat Marwick also asserts that the plaintiffs have not met the strict pleading requirements imposed by the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, which amends the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78u–4. This statute, how-ever, governs *federal* securities fraud claims, and Peat Marwick cites no authority for the proposition that it applies to a common law fraud claim. Accordingly, this Court shall consider Peat Marwick's arguments only as they pertain to Fed. R.Civ.P. 9(b).

**10.** Although *Romani* discusses the requirements for pleading scienter in the context of a 10b–5 claim, the scienter requirement is essentially the same for a common law fraud claim. *See Barrett Assocs.,* 346 Mass. at 152, 190 N.E.2d 867.

fraud with sufficient particularity to avoid dismissal under Rule 9(b).[11]

◼ Peat Marwick also argues that the plaintiffs' claims are barred by the three-year general Massachusetts tort statute of limitations. *See* Mass. Gen. L. ch. 260 § 2A. Under the Massachusetts "discovery rule", however, the statute of limitations does not begin to run until a plaintiff "learns," or "reasonably should have learned" that it has been harmed by the defendant's conduct. *Friedman v. Jablonski*, 371 Mass. 482, 485–86, 358 N.E.2d 994 (1976); *see also McEneaney v. Chestnut Hill Realty Corp.*, 38 Mass. App.Ct. 573, 577, 650 N.E.2d 93 (1995) (citing *Kent v. Dupree*, 13 Mass.App.Ct. 44, 47, 429 N.E.2d 1041 (1982)), *rev. denied* 420 Mass. 1107, 652 N.E.2d 146 (1995); *Cambridge Plating Co. Inc. v. Napco, Inc.*, 991 F.2d 21, 25 (1st Cir.1993). As discussed above, viewing the factual allegations set forth in the Complaint in the light most favorable to the plaintiffs, this Court holds that the plaintiffs should have learned that they had been harmed by Peat Marwick some time between October and the end of December of 1993. Since the plaintiffs filed suit in March of 1996, the common law fraud claim falls within the three-year statute of limitations.

### C. *Count IV: Negligent Misrepresentation*

◼ Peat Marwick contends that the plaintiffs lack standing to state a claim for negligent misrepresentation against Peat Marwick. The plaintiffs acknowledge the absence of direct privity, but assert that they have satisfied the requirements for third party standing under Section 552 of the Restatement (Second) of Torts.[12] In a recent opinion in this District, Magistrate Judge Karol recognized that "(o)n balance, the Restatement test seems to comport best with the Massachusetts cases that have addressed the subject of professional liability in the absence of privity," *Fleet National Bank v. The Gloucester Corp.*, Civil Action No. 92–11812–REK, slip op. at 20 (D.Mass. Aug. 8, 1994), and both parties agree that the Restatement test applies to this case.

In order for a third party to have standing to recover against an independent auditor, Section 552 requires that the auditor, at the moment the audit report was published, *see First Nat'l Bank of Commerce v. Monco Agency, Inc.*, 911 F.2d 1053, 1059–60 (5th Cir.1990), had actual knowledge of the particular third party's reliance on its audit opinions, and actual knowledge that its opinions would impact the particular financial transaction, *Harbor Ins. Co. v. Essman*, 918 F.2d 734, 738 (8th Cir.1990); *see also Scottish Heritable Trust v. Peat Marwick Main & Co.* 81 F.3d 606, 611–12 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 182, 136 L.Ed.2d 121 (1996). Here, in the Amended Complaint, the plaintiffs allege reliance on financial statements issued by Peat Marwick which "Peat Marwick knew to be false, and which Peat Marwick knew that the Reismans were relying on." Amended Compl. ¶ 33A. Thus, the plaintiffs do allege that Peat Marwick had actual knowledge of plaintiffs' reliance, but do not specify whether Peat Mar-

---

**11.** The plaintiffs also assert that Peat Marwick's decision to restate the financial statements of Marcam for the years 1991 through 1993 constitutes an admission by Peat Marwick that it knew the original statements were false at the time they were issued. However, even if, as the plaintiffs claim, a restatement signifies that the correct information was available to the auditor at the time the original statement was issued, Plaintiff's Mem. at 11, it does not necessarily follow that Peat Marwick *knowingly* reported false information. If, for example, Peat Marwick negligently overlooked the correct information, it did not knowingly issue false statements, and thus cannot be held liable for fraud. *See Software Toolworks*, 50 F.3d at 628 (holding that plaintiffs failed to prove scienter because, "[a]t most, the evidence establishes that [the auditor] was negli-

gent in auditing [the company at issue], not that [the auditor] recklessly or knowingly falsified the financial statements").

**12.** Section 552 of the Restatement, entitled "Information Negligently Supplied for the Guidance of Others," provides in pertinent part:

[L]iability ... is limited to loss suffered ... (a) by the person or one of the limited persons for whose benefit and guidance [the auditor] intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that [the auditor] intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
Restatement (Second) of Torts, § 552(2)(1976).

wick obtained this knowledge before or after the various financial statements issued.

On a motion to dismiss, the Court must draw all reasonable inferences in favor of the plaintiffs. *Deren*, 61 F.3d at 1. Nevertheless, given that Varnet did not identify Marcam as an appropriate purchaser of Varnet until early 1993, Compl. ¶ 32, it is not reasonable to read the plaintiffs' Amended Complaint to state that at the time the 1991 and 1992 financial reports were issued, Peat Marwick had actual knowledge that the plaintiffs would rely on such reports in the Varnet–Marcam stock swap transaction. Thus, the plaintiffs may not state a claim for negligent misrepresentation pertaining to the 1991 and 1992 financial reports. In contrast, as to the first and second quarter 1993 10–Q reports, filed in January and May of 1993, respectively, the plaintiffs do have standing to proceed with a negligent misrepresentation claim. Since Varnet identified Marcam as an appropriate purchaser in early 1993, this Court can conceive of a set of facts which, if proven, would demonstrate that Peat Marwick had actual knowledge of the plaintiffs' reliance at the time the two 10–Q reports were issued.[13]

■ Peat Marwick also contends that the plaintiffs' negligent misrepresentation claim is barred by the three-year Massachusetts tort statute of limitations. *See* Mass. Gen. L. ch. 260 § 2A. As discussed above in reference to the common law fraud claim, under the Massachusetts discovery rule, a cause of action does not accrue until the plaintiff learns or reasonably should have learned of the alleged violation. *Friedman*, 371 Mass. at 485–86, 358 N.E.2d 994. Accordingly, the plaintiffs' negligent misrepresentation claim is not time-barred.

### D. Count II: Alleged Violation of Mass. G. L. ch. 93A

Finally, Peat Marwick contends that this Court must dismiss the plaintiffs' Chapter 93A claim because Peat Marwick was not engaged in "trade or commerce." In making this argument, Peat Marwick misconstrues both the nature of the plaintiffs' claim and the scope of Chapter 93A.

■ On January 5, 1988, the General Court of Massachusetts amended Chapter 93A § 1 so as to include the sale of securities within the definition of "trade or commerce." *See Ansin v. River Oaks Furniture, Inc.*, 105 F.3d 745, 759 (1st Cir.1997). Liability arising out of the sale of securities may be imposed under Chapter 93A only if the defendant engaged in the actual sale of securities, which includes, "advertising, the offering for sale, ... the sale, ... or distribution of ... any security." *Salkind v. Wang*, Civil Action No. 93–10912–WGY, 1995 WL 170122, at *9 (D.Mass.1995)(citing Mass. Gen. L. ch. 93A § 1[b] ). In *Salkind*, this Court dismissed a shareholder's Chapter 93A claim against the officers of a computer company because "the actions ... of which [plaintiff] complains—publicly disseminating statements reflecting confidence in the company's future—simply do not constitute 'trade or commerce' as defined under 93A when stock is purchased by investors through open markets." *Id.* Peat Marwick asserts that since it did not engage in the advertising, sale, or distribution of securities or play an active role in the sale of Varnet, its actions did not constitute "trade or commerce" for purposes of Chapter 93A.

The plaintiffs' Chapter 93A claim does not arise out the sale of securities, however. Instead, the plaintiffs allege that Peat Marwick violated Chapter 93A by certifying Marcam's

---

**13.** Peat Marwick contends that these 10–Q reports are unaudited financial statements which do not contain any statement from or certification by Peat Marwick as to the validity of the figures contained therein. Peat Marwick's role, if any, in the production and issuance of these 10–Q reports is a question of fact, however, and may not be addressed by this Court on a motion to dismiss.

Peat Marwick further argues that the plaintiffs could not have relied on the second quarter 10–Q report because, as the plaintiffs acknowledge, this report was issued on May 18, 1993—one day after the plaintiffs signed a letter of intent to sell Varnet. The actual stock swap took place in June, 1993, however, after the plaintiffs had already received the second quarter 10–Q report. The plaintiffs allege that they would not have completed the transaction had the second quarter 10–Q contained accurate information (Amended Compl. ¶ 33A; Plaintiff's Mem. at 10) and therefore have adequately pled reliance on that report.

financial statements when they contained material misstatements and omissions and did not conform to Generally Accepted Accounting Principles, and that as a result of these "unfair and deceptive acts or practices" by Peat Marwick, the plaintiffs lost $14,000,000.00 on the sale of Varnet. Compl. ¶¶ 44–49. The definition of "trade or commerce" under chapter 93A encompasses the "distribution of any services ... directly or indirectly affecting the people of [the] Commonwealth," Mass. Gen. L. ch. 93A ¶ 1(b), so long as the services were rendered "in exchange for some consideration" or there are "other strong indications that the services [were] distributed in a business context." *Barrett v. Massachusetts Insurers Insolvency Fund,* 412 Mass. 774, 777, 592 N.E.2d 1317 (1992) (quoting *Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc.,* 398 Mass. 480, 493, 498 N.E.2d 1044 (1986)). Since Peat Marwick received compensation to audit Marcam and certify its financial statements, this Court rules that Peat Marwick provided accounting services in a business context and thus was engaged in "trade or commerce" for purposes of chapter 93A.

The absence of privity between the plaintiffs and Peat Marwick does not prevent the plaintiffs from stating a claim under chapter 93A § 9. *See Maillet v. ATF–Davidson Co.,* 407 Mass. 185, 190–91, 552 N.E.2d 95 (1990). Section 9 provides a cause of action to "[a]ny person ... who has been injured by another person's use ... [of an unfair or deceptive trade practice]." Mass. Gen. L. ch. 93A § 9; *Maillet,* 407 Mass. at 190–91, 552 N.E.2d 95 (citing *Van Dyke v. St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 448 N.E.2d 357 (1983)).[14] Furthermore, the

United States Supreme Court has recognized that creditors, shareholders, and the general investing public reasonably rely on financial statements certified by public accounting firms such as Peat Marwick. *United States v. Arthur Young,* 465 U.S. 805, 817–818, 104 S.Ct. 1495, 1502–03, 79 L.Ed.2d 826 (1984). "By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client." *Id.* at 817, 104 S.Ct. at 1503.

Chapter 93A is a "statute of broad impact which creates new substantive rights" and provides relief which is "in addition to, and not an alternative to, traditional tort ... remedies." *Linthicum v. Archambault,* 379 Mass. 381, 383, 398 N.E.2d 482 (1979) (quoting *Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 693, 322 N.E.2d 768 (1975)); *see also Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 778, 489 N.E.2d 185 (1986). "The Supreme Judicial Court has interpreted the scope [of] Chapter 93A Section 9 extremely broadly...." *Boos v. Abbott Labs.,* 925 F.Supp. 49, 56 (D.Mass.1996) (Gertner, J.) (citing *Leardi v. Brown,* 394 Mass. 151, 157–63, 474 N.E.2d 1094 (1985)). "[I]t is not a defense to a 93A claim that the defendant's conduct was negligent rather than intentional...." *Linthicum,* 379 Mass. at 388, 398 N.E.2d 482. A practice or act is unfair within the meaning of chapter 93A if it is "within the penumbra of a common law, statutory or other established concept of unfairness." *Heller Financial v. Ins. Co. of North America,* 410 Mass. 400, 408, 573 N.E.2d 8 (1991). Accordingly, this Court cannot say that there exists no set of facts

14. In the Complaint, the plaintiffs do not specify whether they are seeking relief under section 9 or section 11 of Chapter 93A. However, "apart from claims of unfair competition, section 11 applies only between parties having some transactional business relationship." *Cash Energy, Inc. v. Weiner,* 768 F.Supp. 892, 894 (D.Mass. 1991); *see also Standard Register Co. v. Bolton–Emerson, Inc.,* 38 Mass.App.Ct. 545, 551, 649 N.E.2d 791 (1995) (stating that to maintain a "non warranty-based action" under Chapter 93A § 11, parties must be "engaged in more than a minor or insignificant business relationship"). Since the plaintiffs and Peat Marwick did not have any such direct business relationship, the Court views the plaintiffs' claim as proceeding under section 9 of Chapter 93A. The plaintiffs, in fact, did send a pre-suit demand letter to Peat Marwick, Compl. ¶ 48, as section 9 requires. The fact that the plaintiffs are not consumers does not bar them from recovering pursuant to Section 9, as this provision no longer limits relief to consumers, and instead provides a cause of action to "[a]ny person, other than a person entitled to bring action under section eleven of this chapter." Mass. Gen. L. ch. 93A § 9; *Maillet,* 407 Mass. at 190, 552 N.E.2d 95.

which, if proven by the plaintiffs, would bring Peat Marwick's conduct within the scope of Chapter 93A.

### E. *Subject Matter Jurisdiction*

 For the foregoing reasons, the plaintiffs have stated viable state law claims for common law fraud, negligent misrepresentation, and unfair or deceptive trade practices under Chapter 93A. This Court, however, has dismissed the plaintiffs' federal law claims under Section 10(b) and Rule 10b–5 because they are time-barred. Accordingly, this Court must now consider whether it has subject matter jurisdiction over the remaining state law claims.

As if anticipating this problem, the plaintiffs assert the existence of diversity jurisdiction pursuant to 28 U.S.C. § 1332. Peat Marwick counters that complete diversity is absent because the plaintiffs are Florida citizens, and Peat Marwick, as a Delaware limited liability partnership, is considered a citizen of every state in which one of its partners resides, including Florida.

There do not appear to be any published federal decisions addressing the citizenship of a **limited liability partnership** for diversity purposes. In *C.T. Carden v. Arkoma Assocs.*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990), however, a case involving a **limited partnership,** the Court reaffirmed the well-established rule that to determine the citizenship of an unincorporated association for purposes of diversity jurisdiction, a court must look to the citizenship of *all* of the association's members. *Id.* at 195, 110 S.Ct. at 1021. "While the rule regarding the treatment of corporations as 'citizens' has become firmly established," the *Carden* court explained, "we have ... just as firmly resisted extending that treatment to other entities." *Id.* at 189, 110 S.Ct. at 1018 (citing *Chapman v. Barney,* 129 U.S. 677, 9 S.Ct. 426, 32 L.Ed. 800 (1889) [unincorporated joint stock compa-

ny]; *Great Southern Fire Proof Hotel Co. v. Jones,* 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900) [limited partnership association]; *Steelworkers v. R.H. Bouligny, Inc.,* 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965) [labor union] ). Furthermore, the *Carden* court reasoned that the "[fifty] States have created, and will continue to create, a wide assortment of artificial entities possessing different powers and characteristics," *Carden,* 494 U.S. at 197, 110 S.Ct. at 1022, and as a result, the question of which, if any, of these entities is entitled to be treated as a citizen for diversity purposes is better resolved by Congress, *id.*

The plaintiffs assert that under the Delaware limited liability partnership statute, *see* Del.Code Ann. tit. 6 § 1515, only the partners who worked on the audits at issue in this case are subject to potential liability, and that, accordingly, the Florida partners are not a "real party in interest" and should be disregarded when assessing complete diversity. In *Carden,* however, the Supreme Court rejected the analogous argument that the citizenship of a limited partnership may be determined solely by reference to the citizenship of the general partners because only those partners manage the assets and bear the risk of liability. "We have never held that an artificial entity, suing or being sued in its own name, can invoke the diversity jurisdiction of the federal courts based on the citizenship of some but not all of its members." *Carden,* 494 U.S. at 192, 110 S.Ct. at 1019.[15]

Applying *Carden,* this Court holds that for purposes of diversity jurisdiction, a limited liability partnership is a citizen of every state in which one of its partners resides. As the *Carden* court itself noted, this rule "can validly be characterized as technical, precedent-bound, and unresponsive to policy considerations raised by the changing realities of business organization." *Id.* at 196, 110 S.Ct.

---

**15.** The plaintiffs cite *Navarro Savings Assoc. v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980) for the proposition that the "Supreme Court [has] directed federal district courts to disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy," Plaintiffs' Reply to Defendant's Memorandum of January 2, 1997.

However, in *Carden,* the Supreme Court noted that *Navarro* "did not involve the question whether a party that is an artificial entity other than a corporation can be considered a 'citizen' of a state, but the quite separate question of whether parties that were undoubted 'citizens' ... were the real parties to the controversy." *Carden,* 494 U.S. at 191, 110 S.Ct. at 1019.

at 1021. This Court is particularly troubled that a Big Six accounting firm which operates offices within every state in the United States has effectively immunized itself from the reach of the diversity jurisdiction of the federal courts simply by organizing itself as a limited liability partnership rather than a corporation.[16] Nevertheless, until Congress addresses the jurisdictional implications of this new class of business entities, this Court can reach no other result. *See Carden,* 494 U.S. at 197, 110 S.Ct. at 1022.[17] Accordingly, the plaintiffs' state law claims are dismissed without prejudice for lack of subject matter jurisdiction.

## V. Conclusion

For the foregoing reasons, Peat Marwick's Motion to Dismiss is hereby **GRANTED.** As to Counts II, III, and IV only, the dismissal shall be *without prejudice.*

**16.** Peat Marwick may have "won" a bit more than it expected in prevailing on this point. Logic dictates that the doors of the federal courts ought now be closed to Peat Marwick save in cases that involve a federal litigant or which pose a federal question. What is more, having "won" on this point here, Peat Marwick is now judicially estopped from advancing a contrary argument in any other court. *Patriot Cinemas v. General Cinema Corp.,* 834 F.2d 208, 212 (1st Cir.1987).

A review of this Court's computer database reveals that Peat Marwick is presently a litigant in two other active cases in this District. *Federal Deposit Ins. Corp. v. Beal et al.,* 94–40022–NMG; *Federal Deposit Ins. Corp. v. Abrams et al.,* 95–11332–EFH. Subject matter jurisdiction in both these cases appears proper because the FDIC is a litigant. If, hypothetically, the experience of the District of Massachusetts is representative of the other district courts throughout the nation, Peat Marwick would be a litigant in 93 other diversity cases which ought not be pending in federal courts. Since the full systemic public costs of processing a case in a federal district court are a minimum of $4,300 per case (trial costs, of course, are considerably higher, running $10,000 per day in a civil case and $50,000 per day in a criminal case, Hon. William G. Young, *Young on Juries, Judges and Judging* Vol. I at 154 [MCLE 1995]), this would represent, at a minimum, an

unnecessary taxpayer burden of $404,200 (94 × $4,300) imposed on the federal courts.

This is only a hypothetical, however. Unfortunately, at the present time, the federal courts lack a nationwide database containing information on all federal cases. If such a database existed, this Court could conduct a search of every case in which Peat Marwick is a litigant and give proper individual notice to every court in which such cases are pending, thus realizing significant savings. The federal court system, through its data communications network, is approaching such a level of computer sophistication. We're not there yet, but we're working on it.

**17.** In an unreported decision, a federal district court in the Northern District of Illinois stated in dicta that it "appears that the nerve center test [for determining a corporation's principal place of business] would equally apply" to the determination of the citizenship of an Illinois limited liability company for purposes of federal diversity jurisdiction. *Carlos v. Adamany,* 1996 WL 210019, No. 95 C 50264, at *3 n. 4 (N.D.Ill. Apr. 17, 1996). The district court did not provide any support for this conclusion, however, and did not make any reference to the Supreme Court's holding in *Carden,* 494 U.S. at 195, 110 S.Ct. at 1021.