**In re FIDELITY/MICRON SECURITIES LITIGATION.**

**No. 95–12676–RGS.**

United States District Court,
D. Massachusetts.

April 24, 1997.

## MEMORANDUM AND ORDER ON DEFENDANT MAGELLAN FUND AND FIDELITY DEFENDANTS' MOTIONS TO DISMISS

STEARNS, District Judge.

Plaintiffs are investors who purchased Micron Technologies ("Micron") stock in October and November of 1995. They contend that they were victims of a scheme orchestrated by defendants FMR Corporation ("FMR Corp."), Fidelity Management and Research Company ("FMR"), Fidelity Magellan Fund ("Magellan") and Jeffrey Vinik, then the portfolio manager of Magellan, to artificially inflate the price of Micron stock. Plaintiffs allege that the defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)), Rule 10b–5 (17 C.F.R. § 240.10b–5) of the Securities and Exchange Commission ("SEC"), and the Massachusetts Consumer Protection Statute, M.G.L. c. 93A. Plaintiffs also allege that the defendants

committed various common law torts. Plaintiffs filed this class action against FMR Corp., FMR, Magellan and Vinik on behalf of all investors who purchased Micron stock between October 4, 1995, and November 30, 1995.[1]

Defendants now seek dismissal of the Complaint arguing that mutual funds and their managers have no duty to disclose trading strategies to the investing public. Defendants contend that they made no public statements that would have triggered a duty (if one exists) to reveal a decision taken by Vinik to sell off Magellan's stake in Micron. Nor, according to defendants, could any reasonable investor have relied on the statements that Vinik and other FMR personnel did make in deciding whether to buy Micron stock. Magellan makes a separate argument that because no statements can be ascribed to it as an entity, it cannot be held liable under section 10b.

## FACTS

The facts alleged in the Complaint, which for present purposes are deemed to be true, are these. The proposed class consists of all persons who purchased Micron common stock on the open market between October 4, 1995, and November 30, 1995. (Complaint, at ¶ 1). Defendant Magellan is the largest mutual fund in the United States. Its investment portfolio was valued at $53.5 billion on September 30, 1995. (Complaint, at ¶ 35). Defendant FMR is the registered investment adviser for Magellan. FMR provides Magellan with shareholder and managerial services, making all of the Fund's trading decisions and handling all of its communications with shareholders and the public. (Complaint, at ¶¶ 16 and 17). FMR Corp. is FMR's parent company. (Complaint, at ¶ 17(a)). Jeffrey Vinik, an employee of FMR, was a Vice President and the portfolio manager of Magellan from July of 1992 until June 3, 1996. (Complaint, at ¶ 19).

---

1. The Consolidated Class Action Complaint ("Complaint") contains the following claims: Count I—violations of § 10(b) of the Securities Exchange Act (all defendants); Count II—violations of § 20(a) of the Securities Exchange Act (Vinik, FMR Corp. and FMR); Count III—deceit (all defendants); Count IV—violations of M.G.L. c. 93A (all defendants); and Count V—negligent misrepresentation (all defendants).

The crux of the Complaint is the allegation that the defendants "deceive[d] the investing public ... concerning [their] intentions to maintain their large holdings of technology stocks in general, and Micron common stock in particular, when in fact defendants ... intended to [and were] divesting their technology stocks, particularly Micron stock." (Complaint, at ¶ 21(a)). As of August 31, 1995, approximately 5,600 shareholders owned some 200 million shares of Micron[2] common stock. On September 30, 1995, FMR owned 19,620,445 shares of Micron stock, or 9.52% of the issued and outstanding shares. (Complaint, at ¶ 20). Magellan held 11,769,400 of these shares, or 5.7% of Micron's publicly traded stock. Micron was Magellan's third largest holding. *Id.* In October of 1995, Magellan sold 1.3 million of its Micron shares. (Complaint, at ¶ 4). In November of 1995, Magellan "virtually purged itself of the remainder of [its] 11.8 million shares of Micron stock." (Complaint, at ¶ 7).

On November 9, 1995, Magellan issued its Semiannual Report.[3] The Report contained an interview with Vinik entitled "Fund Talk: The Manager's Overview." In this interview

2. Micron, which is not a party to this action, is a public company which manufactures computer memory chips. (Complaint, at ¶ 20).

3. The report was filed as required with the SEC. According to plaintiffs, Fidelity released this report prematurely and in an atypical format in order to bolster the public impression that Vinik remained bullish on Micron. (Complaint, at ¶ 80).

4. In the interview Vinik made the following additional statements in response to scripted questions.

[Regarding a reported reduction of Magellan's technology portfolio from 42.6% of its total holdings to 39.9%] This reduction does not represent a change in my long-term view of the technology sector. My outlook on technology spending in the U.S. and around the world over the next several years continues to be very positive. (Complaint, at ¶ 82).

My bottom-up analysis of companies with the best earnings prospects and stock valuations—prices relative to earnings—kept pointing time and time again to technology companies.... But to reiterate, as I build the fund on a stock-by-stock basis, I continue to find that the majority of stocks with excellent long-term earning prospects and attractive valuations fall into the technology group .... [b]ecause the long-term business and economic elements that

Vinik attributed Magellan's outperformance of its competitors to his heavy investments in technology stocks. He specifically referenced Micron.

[T]he valuations of semiconductor stocks were quite depressed entering the [six month] period [preceding September 30, 1995]. Micron Technology is a good example of these dynamics at work. Its stock price more than·doubled during that period, yet earnings grew so quickly that, in my view, the stock is still relatively cheap. (Complaint, at ¶ 85).[4]

Plaintiffs contend that Vinik's statements were intended to deceive "investors and the market [into believing], by this Report, that Micron continued to be one of the long-term investments favored by Magellan." (Complaint, at ¶¶ 83 and 85). Plaintiffs also point to statements made to various media outlets (CNBC, *The Boston Globe*, *U.S. News and World Report*, *USA Today* and *The Wall Street Journal*) by Vinik and other Fidelity officials as evidence of a concerted scheme intended to artificially bolster the price of Micron shares. (Complaint, at ¶¶ 5, 10(vi), 60, 62, 67 to 80, 87 and 88).[5]

have driven the technology sector are unlikely to change, I anticipate that the fund will remain overweighted in technology relative to the broad market for the foreseeable future. (Complaint, at ¶ 83).

[With regard to his investment philosophy] As to questions about the fund's manageability—or how the fund impacts the overall market—it's important to remember that I invest with a long-term horizon. I acquire stock positions slowly, over a period of time, and sell positions slowly, over a period of time, in seeking the maximum value for the fund's shareholders. (Complaint, at ¶ 84).

5. On November 10, 1995, the Dow Jones Wire Headlines captioned an article "Magellan Fund's Vinik Says Long-Term View Unchanged." On November 13, 1995, *The Wall Street Journal* reported that "Jeffrey Vinik, the fund's 36 year-old portfolio manager, says no one should read too much into the latest numbers. Despite his unhappiness with a handful of tech companies, Mr. Vinik says he hasn't any plans to dump technology stocks, at least not in the near future." (Complaint, at ¶ 87).

Harry Lange, a Fidelity manager and technology expert was also quoted in the September 4, 1995 issue of Barrons as stating that "[t]echnology will continue to be a good place to invest ... third quarter earnings should be extremely good,

On December 1, 1995, *The Washington Post* published an article revealing the fact that Vinik "had been quietly selling most of [Magellan's] stake in [Micron]." (Complaint, at ¶ 92). The pace of the sell-off, according to the article, had accelerated to coincide with the November 9, 1995 release of Magellan's Semiannual Report. (Complaint, at ¶ 93). On the day the article appeared, Micron stock dropped from $54 1/4 a share to a closing price of $51 7/8. (Complaint, at ¶ 94).

The Complaint also quotes various articles published subsequent to Magellan's sale of its Micron holdings as illustrative of the power that Vinik, as manager of the world's largest mutual fund, wielded over the market. "Vinik's influence on the stock market is second only to that of the Federal Reserve Chairman .... [w]hen Vinik buys or sells shares, the market feels the effects," (Complaint, at ¶ 37), the "buy-and-sell decisions of Vinik ... can have a life-and-death impact on the stock price of many high-tech companies"... "everybody on the Street is looking to figure out what [Vinik] is doing." (Complaint, at ¶ 39). Plaintiffs also suggest that because Vinik actively traded on his own account he may have had a personal stake in the scheme to inflate the price of Micron's shares. (Complaint, at ¶ 113).

### LEGAL STANDARDS

When considering a motion to dismiss, "[w]e must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss." *Vartanian v. Monsanto Company*, 14 F.3d 697, 700 (1st Cir.1994). The Complaint must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain a recovery under some actionable theory." *Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir.1996), *quoting Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988). The court may disregard unsupported assertions and legal conclusions

in its analysis. *See Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1216 (1st Cir.1996).

Under Fed.R.Civ.P. 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Where securities fraud is alleged, the particularity requirements are even more stringent.

[G]eneral averments of the defendants' knowledge of material falsity [of disclosures] will not suffice. Consistent with Fed.R.Civ.P. 9(b), the complaint must set forth specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading. The rule requires that the particular times, dates, places or other details of the alleged fraudulent involvement of the actors be alleged.

*Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir.1994) (citations and internal quotation marks omitted). The First Circuit has "been especially rigorous in demanding such factual support in the securities context," *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991), particularly where the possibility exists that plaintiffs are seeking to use discovery as a settlement device rather than as a tool for marshalling evidence to support the merits of their claims. For this reason, heightened pleading is required "even when the fraud relates to matters peculiarly within the knowledge of the opposing party." *Id.* See also *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 174 (1st Cir.1994).

### DISCUSSION

#### Count I—Violations of § 10(b) of the Securities Exchange Act

To state a cause of action under section 10(b) and Rule 10b–5, the plaintiff must plead scienter, a material omission or misrepresentation, and detrimental reliance causing injury, all in connection with the purchase or sale of a security.[6] *Holmes v. Bateson*, 583 F.2d 542, 551 (1st Cir.1978).

---

especially in the semiconductor industry." (Complaint, at ¶¶ 60 and 62).

**6.** Section 10(b) prohibits the use "in connection with the purchase or sale of any security ... [of]

any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 provides that:

*Who Spoke or Failed to Speak?*

■ To bring a defendant within the ambit of Rule 10b–5, plaintiffs must allege a misleading or manipulative representation or omission attributable to that defendant. See *Central Bank v. First Interstate Bank*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). The issue in *Central Bank* was whether section 10(b) covered persons who aid and abet a securities' violation. The Court concluded that the statute prohibits "only the making of a material misstatement (or omission) or the commission of a manipulative act," and therefore applied only to those who in fact engage in prohibited conduct, whether "directly or indirectly." *Id.* at 176–177, 114 S.Ct. at 1447–1448. "Only primary violators, i.e., those who *make* a material misstatement or omission or commit a manipulative act, are subject to private suit under Section 10(b)." *In re Kendall Square Research Corporation Securities Litigation*, 868 F.Supp. 26, 28 (D.Mass.1994) (emphasis in original).

■ The Complaint recites and credits statements "publicly touting the technology sector" to Vinik and other FMR personnel. See nn. 4 & 5, supra. Plaintiffs further maintain that Vinik spoke as a Vice–President and the portfolio manager for Magellan and "that the market understood that he spoke for Magellan." Plaintiffs' Memorandum in Opposition to Magellan's Motion to Dismiss, at 11. Plaintiffs finally note that at least some of the allegedly misleading statements appeared in Magellan's Semiannual Report to its shareholders, and that Magellan directly benefitted from the scheme to manipulate the price of Micron stock. Consequently, plaintiffs argue that Magellan shares primary liability for these statements under section 10(b).

Magellan counters that, as an entity, it made no statements, and that all of the statements set out in the Complaint fall within the scope of the investment management and communications functions delegated to FMR and Vinik.[7]

A mutual fund is a "mere shell," a pool of assets consisting mostly of portfolio securities that belongs to individual investors holding shares in the fund. The management of this asset pool is largely in the hands of an investment adviser, an independent entity which generally organizes the fund and provides it with investment advice, management services, and office space and staff. The adviser either selects or recommends the fund's investments and rate of portfolio turnover, and operates or supervises most of the other phases of the fund's business.

*Tannenbaum v. Zeller*, 552 F.2d 402, 405 (2d Cir.1977) (citations omitted). See also *Burks v. Lasker*, 441 U.S. 471, 480–481, 99 S.Ct. 1831, 1838–1839, 60 L.Ed.2d 404 (1979) (the principal purpose of the Investment Company Act [15 U.S.C. §§ 80a–10(a)–(b), 80a–15(a)–(c) ] is to protect mutual fund investors by maintaining the fund as an entity independent of its adviser). In the same vein, the Senate Committee overseeing the passage of the Securities Law Enforcement Remedies Act of 1990 stated:

[t]he Committee also expects that the SEC will not ordinarily seek penalties against registered investment companies. Generally, an investment company is a managed portfolio of liquid assets, with all the expenses passed on to shareholders. While the legislation permits civil penalties based on violations of the Investment Company

---

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1987).

**7.** As Magellan points out, the statements attributed to Vinik in its Semiannual Report appear in an interview whose very caption ("Managers Overview") made clear that Vinik was speaking *in his capacity as Magellan's portfolio manager*, consistent with SEC requirements. Magellan Reply Memorandum, at 14.

Act, the penalties generally would be assessed against the responsible individuals. S.Rep. No. 337, 101st Cong., 2d Sess., at 17 (1990).

The Complaint acknowledges that Magellan is registered under the Investment Company Act and that FMR by contractual delegation is responsible for all of the Fund's trading decisions and communications. (Complaint at ¶¶ 18, 17(b) and 23(a)–(b)). As this responsibility was exclusive to FMR, Vinik's statements could only have been made in his capacity as an employee of FMR. Thus, statements by Vinik and other FMR employees cannot be imputed to Magellan.

Plaintiffs seek to surmount this obstacle by arguing that *Central Bank* does not preclude the liability of a principal for the acts of its agent.[8] The Supreme Court in *Central Bank* held that Congress's omission of "aiding and abetting" from the language of section 10b concluded the issue of the statute's reach and coverage. 511 U.S. at 175, 114 S.Ct. at 1447. "The proscription [of the statute] does not include giving aid to a person who commits a manipulative or deceptive act. We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute." *Id.* at 177–178, 114 S.Ct. at 1448. As the Court pointed out, a critical element of Rule

10b–5 liability, reliance on a defendant's misstatement or omission, would be missing if liability were to be imposed on aiders and abetters. *Id.* at 180, 114 S.Ct. at 1449–1450.

The same is true here. To hold Magellan liable under Rule 10b–5 on a theory of respondeat superior would impose liability without any showing that the market relied on statements or actions directly or indirectly attributable to Magellan in evaluating Micron shares.[9] See *In re Prudential Insurance Company*, 1996 WL 392145, Fed. Sec. L. Rep. P 99,237 (D.N.J., May 10, 1996) (*Central Bank* strongly implies that respondeat superior liability is not available under section 10(b)); *ESI Montgomery County, Inc. v. Montenay Intern. Corp.*, 1996 WL 22979, Fed. Sec. L. Rep. P 99,345 (S.D.N.Y., January 23, 1996) (defendant fund not liable under Rule 10b–5 for alleged misrepresentations of its managers in light of the holding of *Central Bank*). Cf. L. Loss, *Securities Regulation*, at 984 (Supp.1996) ("Given [*Central Bank*] ... it appears highly unlikely that a private plaintiff or the [SEC] can maintain a § 10(b) lawsuit with a *respondeat superior* claim").[10]

*Can Defendants be Held to a "Duty to Disclose?"*

To make out a cause of action for an omission, or failure to speak, in a securities

---

**8.** In support of this argument, plaintiffs cite only pre-*Central Bank* Circuit Court precedents. See, e.g., *In re Atlantic Financial Mgmt., Inc. Sec. Litig.*, 784 F.2d 29, 32–35 (1st Cir.1986) (allowing imposition of vicarious liability under section 20(a)). Plaintiffs Sur-Reply Memorandum, at 3 n. 1.

**9.** Magellan notes that plaintiffs are unable to allege any act on its part that could be fairly characterized as the act of a primary violator of the securities' laws. As Magellan neatly sums up its argument, "[i]f Magellan truly were a *primary* speaker, resort [by plaintiffs] to *vicarious* liability theories would obviously be unnecessary." Magellan Reply Memorandum, at 1.

**10.** Plaintiffs contend that this reading of Central Bank in effect confers immunity on corporate entities "that can only speak through their duly appointed officers and agents." Plaintiffs' Opposition Memorandum, at 16. Magellan's response to this seemingly compelling argument is worth quoting at length.

No one disputes that a corporation can speak through its directors or officers, as well as through its articles of incorporation, by-laws,

and the like. The difference between primary corporate liability, which survives *Central Bank*, and secondary liability, which does not, lies in the fact that in primary liability the corporate delegate has spoken *as the corporation*. By contrast, in the realm of vicarious liability, a corporate delegate has simply spoken in the scope of his employment or agency and the corporation is strictly liable by reason of that relationship. To be sure, prior to *Central Bank*, when a corporation's delegate spoke, sometimes the corporation could be both primarily *and* secondarily liable. Indeed, when a corporation is a primary violator, it would nearly always meet the requirements of vicarious liability as well (were those requirements still in force). But the converse is not true. Simply because a corporation satisfies the requirements of vicarious liability for the acts of its delegate does not mean that the delegate has acted "as" the corporation and does not mean the corporation is "primarily" liable.

Magellan Reply Memorandum, at 9 (citations omitted). See also *Holmes*, 583 F.2d at 561.

case, a plaintiff must plead an affirmative duty of disclosure. *Central Bank*, 511 U.S. at 174, 114 S.Ct. at 1446–1447.[11] "[A] duty to disclose arises when one party has information 'that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) (citations omitted). The plaintiffs make no suggestion that any such duty or relationship existed here, and acknowledge that the fiduciary duty Vinik owed was to Magellan's shareholders and not to the investing public at large. Plaintiffs' Memorandum in Opposition to Fidelity Defendants' Motion to Dismiss, at 3.

■ The law imposes broader liability for affirmative misrepresentations. A company will be found liable under Rule 10b–5 where it has affirmatively misled investors into purchasing its stock by providing materially false or incomplete information. See generally *Shaw*, 82 F.3d at 1202; *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.1990) (en banc); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26 (1st Cir.1987). Corporate insiders are held to fiduciary standards to prevent them from taking unfair advantage of uninformed investors. *Chiarella*, 445 U.S. at 229, 100 S.Ct. at 1115.[12] A duty derivative of that imposed on insiders is also applied to "tippees," *SEC v. Maio*, 51 F.3d 623, 631–633 (7th Cir.1995), and to "scalpers" (ostensibly disinterested investment advisers recommending stocks without revealing their personal stake in the transaction). See *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir.1985).

As plaintiffs correctly state, a viable section 10(b) claim can be pled without alleging the existence of a fiduciary relationship. Most of the cases cited by plaintiffs involve scalping. See *United States v. Russo*, 74 F.3d 1383 (2d Cir.1996) (criminal stock park-ing); *United States v. Regan*, 937 F.2d 823 (2d Cir.1991) (underwriter arranged for a "short sale" of stock to depress its price while concealing his involvement in the deal); *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir.1979) (newspaper columnist purchased stock in a company about which he wrote a favorable article without disclosing his interest); *United States v. Cannistraro*, 800 F.Supp. 30 (D.N.J.1992) (defendants disseminated statements to the investing public concerning the merits of certain securities without disclosing their interest); *United States v. Eisenberg*, 773 F.Supp. 662 (D.N.J.1991) (same); *SEC v. Blavin*, 557 F.Supp. 1304 (E.D.Mich.1983), aff'd, 760 F.2d 706 (6th Cir. 1985) (defendant purchased large amounts of securities, authored and disseminated a newsletter touting these same securities without disclosing his interest). See Plaintiffs' Memorandum in Opposition to Fidelity Defendant's Motion to Dismiss, at 34–39. This case is the reverse of the typical scalping case in the sense that Vinik's alleged purpose was not to conceal an interest in Micron, but rather to foster a belief that he had such an interest when in fact he did not. The analogy plaintiffs draw to the classical model of scalping is not without force.

> Vinik publicly stated or implied that Magellan would not sell its substantial holding in Micron, which he communicated as a "buy," knowing that his power and influence over the market was such that investors would respond by buying Micron, and thereby allow defendants to dump Micron at prices inflated by his favorable statements.[13]

*Id.*, at 35.

### Plaintiffs' Theory of the Case

The crux of plaintiffs' theory of the case is laid out in paragraph 21 of the Complaint:

---

**11.** As defendants point out, securities law imposes no statutory duty on a mutual fund to disclose its future trading intentions or contemporaneous trading decisions. Fidelity Defendants' Opposition Memorandum, at 13. See *Glassman*, 90 F.3d at 632; *Shaw*, 82 F.3d at 1209.

**12.** A corporation trading in its own securities is treated "as an 'insider' for purposes of the 'disclose or abstain' rule." *Shaw*, 82 F.3d at 1203.

**13.** There is authority supporting plaintiffs' contention that "the 'scalping' theory of manipulation is not premised on the making of misrepresentations that only relate to the giving of investment advice, as suggested by defendants." *Id.*, at 37. See *Abelson v. Strong*, 644 F.Supp. 524, 527–528 (D.Mass.1986).

Prior to the beginning of the Class Period, the defendants embarked upon a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:

(a) deceive the investing public, including plaintiffs and the other Class members, concerning the defendants' intentions to maintain their large holdings of technology stocks in general, and Micron common stock in particular, when in fact defendants not only intended to but were in fact divesting or selling their technology stocks, particularly Micron stock;

(b) artificially inflate, manipulate and support the demand for, the volume of trading in, and the market price of technology stocks, particularly Micron common stock, so that defendants could secretly dump most of their investment in technology stocks, and in particular nearly all of their Micron investment, in order to realize grater proceeds on those investments than they would have had the market become aware of defendants' intent to sell or actual selling of such stock;

(c) cause plaintiffs and the other members of the Class to purchase Micron stock at artificially inflated and manipulated prices while Magellan and other Fidelity Funds were secretly liquidating their investments in Micron at those prices;

(d) allow Magellan and other Fidelity Funds to attract both additional investors and monetary contributions from existing customers as Magellan and the other Fidelity Funds reported gains in their technology holdings and Micron stock, which absent the course of conduct specified herein, they would not otherwise have obtained;

(e) allow Vinik to increase his substantial salary, and any bonus based on Magellan's performance; and

(f) allow Fidelity Management to increase its substantial management or other fees from Magellan, which fees were specifically pegged to Magellan's

asset size and its performance relative to the S & P 500 index.

What plaintiffs describe is a species of securities manipulation called "fraud-on-the-market."

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic Inc. v. Levinson*, 485 U.S. 224, 241–242, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988), *quoting Peil v. Speiser*, 806 F.2d 1154, 1160–1161 (3d Cir.1986). In a fraud-on-the-market case,

> the statements identified by plaintiffs as actionably misleading are alleged to have caused injury, if at all, not through the plaintiffs' direct reliance upon them, but by dint of the statements' inflating effect on the market price of the security purchased. When the truth is disclosed and the market self-corrects, investors who bought at the inflated price suffer losses. Those losses can be deemed to have been caused by the defendants' statements, even absent direct reliance by plaintiffs, because the statements were presumptively absorbed into and reflected by the security's price.

*Shaw*, 82 F.3d at 1218 (internal citations omitted).

The "reasonable investor" in this context is, of course, the market itself, because it is the market, and not individual investors which decides stock prices. While the "presumption of investor reliance on the integrity of stock prices has the primary effect of obviating the need for plaintiff purchasers to plead individual reliance ... [it] also shifts the critical focus of the materiality inquiry." *Shaw*, 82 F.3d at 1218. This is because "[t]he market is not so easily duped, even

gra.ited that individual investors sometimes are." *Id.*

It is to this focus that defendants turn. As they frame their argument,

> [t]he issue presented on this motion to dismiss is whether Fidelity's public statements reasonably implied that Vinik would not sell Magellan's Micron stock. None of Vinik's statements declares an intention not to do so expressly. Plaintiffs claim of misrepresentation rests, instead, upon an inference which the market allegedly drew from those statements. As a matter of law, however, it would have been unreasonable for market investors to infer from Vinik's statements that he would not sell Magellan's Micron holdings.

Fidelity Defendants' Reply Memorandum, at 1–2.

Defendants contend that the Complaint fails to demonstrate that any of Vinik's statements were factually untrue, and that they were thus incapable of misleading the market. Fidelity Defendants' Opposition Memorandum, at 8. This argument can be disposed of rather summarily, at least insofar as it rests on an abstraction. That a statement is literally true does not necessarily insulate its author from liability. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2d Cir.1990). "[E]mphasis and gloss can, in the right circumstances, create liability." *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 203 (5th Cir.1988). "When a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *Roeder,* 814 F.2d at 26. See also *Backman,* 910 F.2d at 16. A corporation, in

other words, has a duty to ensure that material information is disclosed in such a way that it can be understood by the investing public in essentially the same way as it would be perceived by corporate insiders.

Defendants claim that Vinik's citation of Micron as a "relatively cheap" stock in Magellan's Semiannual Report would have been understood by the market to refer to Micron's value during the six months leading up to September 30, 1995 (the closing date of the Report), and that investors could not have reasonably relied on a statement made on or before September 30, 1995, in purchasing Micron stock on or after November 9, 1995, the date on which the Report was released. Such information defendants argue, would have been recognized by the market as "stale," and thus immaterial to its valuation of Micron's shares. Fidelity Defendants' Memorandum, at 26, 32. Finally, defendants insist that because Vinik never used the words "buy," "sell," "hold," or their equivalents, no reasonable investor would have construed his comments as relevatory of his trading intentions with regard to Micron. *Id.* at 21.[14]

The Complaint alleges that the interview did not clearly convey to the investing public that Vinik's comments were "as of" September 30 or that they pertained to Magellan's portfolio as of that date. (Complaint, at ¶ 81). Plaintiffs also allege that the market paid close attention to Fidelity's listing of Magellan's ten largest holdings in its monthly "Mutual Fund Guide," despite the five or six week publication delay. (*Id.* at ¶ 43). More fundamentally, under plaintiffs' theory, it could be (and is) argued that Vinik made the statement regarding Micron in September, and deliberately timed its release to divert attention from his plan to liquidate the bulk of Magellan's Micron stock in November, anticipating (accurately) that the market would misinterpret his remarks. While a court may determine that a statement could not, as a matter of law, have misled reason-

---

**14.** Defendants also argue that the statement ("relatively cheap") referred to only one factor (price/earnings ratio) that Vinik considered in deciding whether to buy or sell a stock. Fidelity Defendants' Reply, at 15–17. Defendants' argu- ment rests on the assumption that the market knew that as a fact, something that I deem outside the permissible contours of a motion to dismiss. See *Shaw,* 82 F.3d at 1214 n. 25.

able investors, the issue of whether an omission or misleading statement is material is ordinarily a question of fact for the jury. *Lucia*, 36 F.3d at 176. Compare *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 283–284 n. 12 (3d Cir.1992) (quarterly report stating that the company "looks to the future with great optimism . . . is clearly unactionable puffing"). A simple test of materiality in a fraud-on-the-market case is whether the alleged misrepresentation in fact affected the market. Here, according to the Complaint, the revelation by *The Washington Post* on December 1, 1995, that Vinik had secretly reversed his course on Micron precipitated an immediate drop in Micron's price. There may be other plausible explanations for the fall-off, but I cannot say as a matter of law that a fair-minded jury could not, if plaintiffs' allegations are true, hold defendants liable for the deception.

■ The same cannot be said about the two additional Micron statements the Complaint attributes to Vinik. These are an article in the October 5, 1995 *Wall Street Journal* (reprinted in its October 11, 1995 European edition) in which Vinik is quoted as saying that many technology stocks "are still buys, despite the fact that they have run up strongly so far this year." The article ascribes no statements to Vinik regarding Micron and mentions Micron only in the context of an observation by the reporter that Micron was one of Magellan's "big tech holdings."[15] Vinik cannot be held responsible for a reporter's comments.[16] *See Raab v. General Physics Corp.*, 4 F.3d 286, 288 (4th

Cir.1993); *Haft v. Eastland Financial Corp.*, 772 F.Supp. 1315, 1319 (D.R.I.1991). Cf. *Suna v. Bailey Corp.*, 107 F.3d 64, 74 (1st Cir.1997). The second Vinik statement extolling Micron was made to *U.S. New & World Report* during a November 6, 1995 interview in which Vinik reportedly commended Micron as a stock whose "valuations are reasonable and the fundamentals still outstanding." The statement, however, was not published until December 11, 1995, well after the close of the proposed class period.[17]

The remaining statements attributed to Vinik and other FMR employees can at best be read as supportive of technology stocks in general without any specific mention of Micron.[18] Indeed, in one of the cited articles Vinik explicitly referred to the fact that he had been taking profits on technology stocks and had reduced positions in some that he expected to report "disappointing earnings over the next quarter or two." As defendants fairly point out, given the hundreds of stocks that make up the technology sector, no reasonable investor could have taken these statements as either a signal to buy Micron or as an assurance that Vinik intended to maintain Magellan's position in Micron. Fidelity Defendants' Opposition Memorandum, at 29; Fidelity Defendants' Reply, at 8.[19]

*Count II—Section 20(a)—Control Person Liability*

■ Count II of the Complaint alleges violations of section 20(a) of the Securities Exchange Act. Section 20(a) authorizes a

---

**15.** The article also stated that Vinik "says Magellan has trimmed some tech positions that 'ran up close to full valuation.' He won't be specific."

**16.** Even if Vinik was the source of the reporter's information, I agree with defendants that the issue is "not what Vinik did or did not say . . . but whether the market could reasonably have drawn the inference from the text of [this article] that Vinik would not sell Magellan's investment in Micron." Fidelity Defendants' Reply, at 11. *Simon v. American Power Conversion Corp.*, 945 F.Supp. 416 (D.R.I.1996), which plaintiffs suggest as authority buttressing their argument that the reference to Micron in the Journal article should be attributed to Vinik, involved inside information of the kind that the reporter would not likely have acquired from anyone but a knowledgeable corporate official. That Magel-

lan, at the time of the *Journal* article appeared, held a large stake in Micron was hardly an insider secret.

**17.** This is not to say that plaintiffs might not be able to prove that Vinik made the statement with the expectation that it would be published sooner, in which case it would be relevant to the issue of scienter.

**18.** Many of these statements substantially predate the proposed class period.

**19.** This is not to say that the statements might not be relevant to explain the context of Vinik's statements regarding Micron in the November 9, 1995 Semiannual Report. It is only to say that they are not actionable under plaintiffs' theory of the case.

cause of action against any individual who exerts direct or indirect control over a corporation that acts in violation of the securities laws. Plaintiffs allege that FMR Corp., as the controlling shareholder of FMR, exercised its power over FMR and Vinik to cause them to engage in securities violations. Plaintiffs also claim that FMR (through Vinik) exerted like power and control over Magellan. Defendants do not contend that they were not "control persons" within the meaning of section 20(a). To the extent that plaintiffs have alleged an underlying securities act violation in Count I, the motion to dismiss Count II will be *DENIED*.

*Count III (Deceit), Count IV (M.G.L. c. 93A) and Count V (Negligent Misrepresentation)*

The defendants do not address the state law claims in any substantive depth, but rather suggest that if the court were to dismiss the federal claims in their entirety, it should decline pendent jurisdiction. Fidelity Defendants' Opposition Memorandum, at 41. This issue will best be revisited on a motion for summary judgment.

### ORDER

For the foregoing reasons, Magellan's motion to be dismissed from Count I of the Consolidated Class Action Complaint is *ALLOWED*. FMR, FMR Corp. and Vinik's motion to dismiss Count I of the Consolidated Class Action Complaint is DENIED as to those plaintiffs who purchased Micron stock between November 9, 1995 and November 30, 1995.[20] FMR, FMR Corp. and Vinik's motion to dismiss Count II of the Consolidated Class Action Complaint is DENIED. Defendants' motion to dismiss Counts III, IV and V of the Consolidated Class Action Complaint is *DENIED*. The parties shall within twenty-one (21) days submit a Proposed Order regulating discovery.

SO ORDERED.

---

20. Plaintiffs Jennifer T. & Robert J. Alden, Larry C. Bowman, Trustee, Robert C. Daniels, Gary Del Piano, Robert L. Dworkin, Toby and Sander Gorberg, Joshua Morgenstern, Thomas C. Pitten, Dr. Joseph Sorrentino, Thomas and Kevin Stack, JT, and Valentina Vanderbush, Trustee, purchased all of their Micron stock prior to November 9, 1995. (Complaint, ¶ 15). Their cases will accordingly be *DISMISSED*.