Joseph **CHALVERUS**, John T. Beales, III, Charles Ellsworth, Robert Harrer, Simon He, Gary Malazian, Stephen Rocci, Merlin Riley, III, and Andy Tynes, Plaintiffs,

v.

**PEGASYSTEMS, INC.**, Alan Trefler, and Ira Vishner, Defendants.

No. Civ.A. 97–12570–WGY.

United States District Court, D. Massachusetts.

July 30, 1999.

---

1. Defendant offered other arguments in support of summary judgment, which it is not necessary for the court to address.

Thomas G. Shapiro, Shapiro, Haber & Urmy LLP, Boston, MA, for Plaintiffs.

John D. Donovan, Jr., Elizabeth K. Frumkin, Ropes & Gray, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

This is a securities fraud action brought on behalf of persons who purchased the common stock of Pegasystems, Inc. ("Pegasystems") between July 2, 1997 and October 29, 1997 ("the Class Period"). The plaintiffs (collectively, "Chalverus") allege violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and. Rule 10b–5 promulgated thereunder by Pegasystems, Alan Trefler ("Trefler"), and Ira Vishner ("Vishner") (collectively, "the defendants").

The defendants move to dismiss the First Amended Complaint for failure to meet the pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9[b]") and the Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 104–67, 15 U.S.C. § 78u–4 (1995).

### A. Factual Background

Chalverus' complaint develops the following alleged scenario:

Pegasystems develops customer service management software. Trefler is the company's president and chief executive officer. At the time of these events, Vishner was the company's chief financial officer.

As in many securities fraud cases, Chalverus' allegations revolve around improper accounting procedures. See Steven Wilmsen, "Ticker Tape in Courtroom: Shareholder Suits Flourish," The Boston Globe, July 4, 1999, at G1 (noting that more than half of the securities fraud class actions filed in 1998 involved allegations of accounting fraud). On July 2, 1997, Pegasystems issued a press release announcing that it had entered into an agreement with First Data Resources Corp. ("First Data") to use and re-license Pegasystems' relationship management and rules-based work flow technology in the card issuing market ("the Agreement"). See Compl. ¶ 36. The press release quoted Trefler as saying that "the value of the agreement is expected to exceed $50 million during the next five and a half years." Id. at ¶ 38.

According to Chalverus, however, the press release did not disclose that Pegasystems had entered into a reciprocal cross-licensing agreement with First Data to acquire a license for First Data's Empowered System Platform ("ESP") software in exchange for a $10,000,000 payment to First Data and a warrant for First Data to acquire $2,900,000 worth of Pegasystems' common stock. See id. at ¶ 40.

Chalverus also alleges that at about the same time Pegasystems announced the First Data agreement, the defendants realized that the company would incur a loss for the second quarter of 1997, thereby ending forty-nine consecutive quarters of profitability. Chalverus contends that to avoid this result, the defendants improperly recognized $5,000,000 in software licensing revenue from the First Data agreement in the second quarter in violation of generally accepted accounting principles ("GAAP"). See id. at ¶¶ 42–45. Consequently, Pegasystems falsely reported second quarter earnings of $2,200,000 on revenue of $12,200,000. See id. at ¶ 42. On July 15, 1997, Pegasystems' common stock rose to a Class Period high of $38.50 per share. See id. at ¶ 53.

On July 29, Pegasystems issued a press release approved by Trefler and Vishner announcing that it had achieved record

revenue for the second quarter, "the 50th consecutive quarter of profitability." *Id.* at ¶ 41. On or about August 14, 1997, Pegasystems filed its Form 10–Q for the second quarter, signed by Vishner, which reiterated the financial results announced in the July 29 press release and purported to be prepared "in accordance with generally accepted accounting principles for interim financial information." *See id.* at ¶¶ 47, 51. The Form 10–Q also stated that:

> Software license revenue for the 1997 Three Month Period increased 131.9% to $9.0 million from $3.9 million for the 1996 Three Month Period. Software license revenue for the 1997 Six Month Period increased 141.8% to $15.5 million from $6.4 million for the 1996 Six Month Period. The increase in software license revenue was *primarily attributable to software license acceptance by new customers, software license agreement renewals,* and extended software usage by existing customers.

*Id.* at ¶ 49 (emphasis added). According to Chalverus, however, the increase in software license revenue was primarily due to the improper recognition of $5 million from the license to First Data. *See id.* at 50.

After the close of trading on October 29, 1997, Pegasystems announced in a press release that it "was surprised [ ] by a revised assessment by [Ernst & Young] that recommends a restatement of . . . up to 5 million dollars in revenue and a change to expected accounting in the third quarter that could have a significant adverse impact on third quarter financial results." *Id.* at ¶ 55. The next day, shares of Pegasystems' stock fell thirty-four percent to $18.38 per share. In the three months following the October 29 announcement, shares of Pegasystems stock traded at an average price of $18.746. *See id.* at ¶ 56.

On November 6, 1997, Pegasystems filed a Form 8–K stating that Ernst & Young had resigned as its auditors based on the

recommendation of Pegasystems' board of directors. *See id.* at ¶ 58. The Form 8–K went on to say that there was a

> disagreement which arose [with Ernst & Young] in late October 1997 concerning the Registrant's financial statements for the quarter ended June 30, 1997. The disagreement involves the appropriate treatment for a series of transactions . . . entered into by the Registrant with First Data . . . in June 1997. Contrary to the expectations of the Registrant . . . at the time the First Data Transactions were being negotiated, E & Y recently advised the Registrant that $5 million of software license revenue recognized by the Registrant in the quarter ended June 30, 1997 from one of the First Data Transaction[s] should not have been recognized in that quarter. Accordingly, E & Y has advised the registrant to restate its financial statements for the three and six month[ ] periods ended June 30, 1997.
>
> ***
>
> E & Y advised the Registrant that it disagreed with the accounting approaches preliminarily proposed by the Registrant for recognizing revenue from the First Data Transactions in the quarter ended September 30, 1997 . . . . The Registrant is in the process of determining the proper accounting for the First Data Transactions in the quarter ended September 30, 1997 and therefore does not necessarily have a difference of opinion with E & Y with respect thereto.

*Id.* at 59.

The same day, Vishner told Bloomberg News Service that Ernst & Young had "said the company was in good shape," and that the auditor stood by the second quarter results as late as the second week in October. *Id.* at ¶ 60. The next day, the Dow Jones news service reported that according to Vishner, Pegasystems had "prepared its second-quarter results in June based on the advice of Ernst & Young." *Id.* at ¶ 61. Vishner further stated that

"[a]t the moment I can't say there is disagreement because we can't say what we should be doing. Having gotten advice from them last week that the previous advice was not correct and we should restate our earnings, we do not know what is right." *Id.*

On November 18, the company issued a press release announcing its third quarter results and its restated second quarter results. As to the second quarter, revenue was restated to deduct $5,000,000. Earnings per share were restated to a loss of $0.03 per share from a profit of $0.08 per share. *See id.* at ¶ 63. The release also stated that Pegasystems' third quarter results had been impacted by the accounting for its transactions with First Data and that it had suffered a third quarter net loss of $2,200,000. *See id.* at ¶ 65.

Also on November 18, the company filed an amended Form 8–K/A with an attached letter from Ernst & Young dated November 14, 1997. In its letter, Ernst & Young stated that "[w]e ... believe that [the company's explanation of events] is not accurate as to its description of disagreements ... between [Pegasystems] and us and with respect to reportable events." *Id.* at ¶ 66. The letter went on to say that conversations between Ernst & Young and Pegasystems "did *not* provide a basis to conclude [that Ernst & Young] had made any determination of the appropriate accounting for the [First Data] transaction." *Id.* (emphasis added).

On November 19, Pegasystems filed a Form 10–Q/A with its restated second quarter financial results. The Form 10–Q/A restated software license revenue to $3,980,000, down $5 million from the previously-reported $8,980,000. *See id.* at ¶ 69. The Form 10–Q/A explained that "the Company's independent auditors notified the Company of a revised assessment [of] the revenue recognition with respect to a contract signed with a customer prior to June 30, 1997. As a result, the Company has reversed software license revenue in the amount of $5.0 million." *Id.* at ¶ 71.

Also on November 19, Pegasystems filed its Form 10–Q for the third quarter of 1997, which was signed by Vishner. *See id.* at ¶ 72. The Form 10–Q revealed for the first time that during the third quarter, the company had paid First Data $10,000,000 to license First Data's ESP software and had issued a stock warrant to First Data with a value of about $2.9 million. *See id.* at ¶¶ 72, 73.

On April 2, 1998, Pegasystems issued a press release disclosing, among other things, that it would further restate its financial results for the second quarter of 1997. *See id.* at ¶ 78. The company restated its revenue from $7,200,000 to $4,700,000 and its earnings from a loss of $865,000 to a loss of $2,800,000. *See id.* The release explained that Pegasystems further restated its results "to reflect changes in the timing of revenue recognition and expense on certain contracts and increased reserves for revenue and doubtful accounts." *Id.* at ¶ 79. The release quoted Vishner as saying, "[w]e have been working closely with our new accountants, and expect that accounting related issues are now behind us." *Id.*

Chalverus filed a complaint alleging securities fraud on November 18, 1997. On February 3, this Court entered an order to consolidate several actions brought against Pegasystems. Chalverus filed a Consolidated Complaint on March 30, 1998, which Pegasystems moved to dismiss on October 20, 1998. At oral argument, Chalverus agreed to amend the Consolidated Complaint in light of this Court's opinion in *Lirette v. Shiva Corporation,* 27 F.Supp.2d 268 (D.Mass.1998). Chalverus filed the First Amended Complaint ("the Complaint") on June 2, 1999, alleging that statements in the July 2, 1997 press release, the July 29, 1997 press release, and the August 14, 1997 Form 10–Q constituted securities fraud. Pegasystems now moves to dismiss the Complaint for failure to plead in accordance with Rule 9(b) and the PSLRA.

### B. Relevant Legal Standards

In reviewing a motion to dismiss, the Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 988 (1st Cir.1992). The Court may grant dismissal only if "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 24 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)).

In a securities action, two additional considerations bear upon the motion to dismiss: Rule 9(b) and the PSLRA, both of which concern the legal sufficiency of a complaint. Rule 9(b) imposes a heightened pleading standard on plaintiffs alleging fraud: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated *with particularity.*" Fed.R.Civ.P. 9(b) (emphasis added).

. The PSLRA attempts to make the pleading standard in securities fraud cases even more rigorous than Rule 9(b) traditionally has required.[1] Under the PSLRA, a complaint alleging securities fraud must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In order sufficiently to allege scienter under the PSLRA, the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2) (emphasis added). *See In re PLC Systems, Inc. Sec. Litig.*, 41 F.Supp.2d 106, 114 (D.Mass.1999) (Stearns, J.).

When a complaint fails to meet these requirements, dismissal is required. *See id.* at § 78u–4(b)(3)(A).

### C. Analysis

In order to survive this motion to dismiss, the Complaint must allege with requisite particularity that (1) Pegasystems made materially false and misleading misrepresentations or omissions, and (2) Pegasystems acted with scienter. *See Lirette*, 27 F.Supp.2d at 274–75.

#### (1) Section 10(a) and Rule 10(b)–5

##### (a) Materially False and Misleading Misrepresentations and Omissions

The Complaint alleges that Pegasystems made false and misleading misrepresentations or omissions constituting securities fraud on three occasions. First, Chalverus points to Trefler's statement in the July 2, 1997 press release that:

> By partnering with First Data, the global leader in payment systems processing, we solidify our dominant position in serving the financial services industry. The combination of our respective technical and industry expertise will enable us to deliver superior solutions to existing and prospective customers in the card market. This is an exceptional opportunity for us; the value of the agreement is *expected to exceed $50 million during the next five and a half years.*

Compl. ¶ 38 (emphasis supplied). According to Chalverus, this statement was false and misleading because it failed to disclose that under the terms of the Agreement, (1) Pegasystems was obligated to pay $10,-000,000 to First Data for access to the designs, specification, and code of First Data's ESP software; (2) Pegasystems had issued to First Data a warrant valued at $2,900,000 million in consideration for First Data's entering into the Agreement;

---

[1]. The First Circuit does not interpret the PSLRA to differ from the rigorous standard it historically has applied in securities fraud cases under Rule 9(b). *See Maldonado v.*

*Dominguez,* 137 F.3d 1, 9 n. 5 (1st Cir.1998) (citing *Greenstone v. Cambex Corp.*, 975 F.2d 22, 22 (1st Cir.1992)).

(3) the $12,900,000 would have to be capitalized and amortized over the term of the Agreement, thereby impacting Pegasystems' reported operating results for over a five and a half year period; (4) Pegasystems was required to provide services to First Data necessary to incorporate Pegasystems' software into First Data's applications; (5) the services to be provided would preclude Pegasystems from recognizing revenue on the Agreement on an accelerated basis in the second or third quarter of 1997; rather, revenue would be recognized pro rata over the life of the contract as services were performed; and (6) Pegasystems would need access to the designs, specifications, and code of First Data's ESP Product in order to provide the contracted services. *See id.* at ¶ 40.

Chalverus next focuses on Pegasystems' July 29 press release (approved by Trefler and Vishner), which stated that it had "achieved record earnings and revenues for the second quarter of 1997 ending on June 30, 1997." *Id.* at Ex. 2. The press release reported revenues of $12,200,000 and earnings of $2,200,000, making the second quarter of 1997 "the 50th consecutive quarter of profitability" for Pegasystems. *Id.* It also reported that Pegasystems had $128,000,000 in assets, $19,000,000 in liabilities, and $109,000,000 in total equity. *See id.* Chalverus contends the financial results reported in the July 29 press release were false and misleading because (1) Pegasystems overstated revenues and related receivables by $5,000,000; (2) Pegasystems had not achieved record revenue or earnings; (3) the quarter was not profitable; (4) Pegasystems failed to record as a $12,900,000 capitalized asset the cost incurred to license First Data's technology and induce First Data to enter into the Agreement (which would have to be amortized over future periods); (5) Pegasystems failed to record as a liability its obligation to pay First Data $10,000,000; and (6) Pegasystems failed to record as a component of its stockholders' equity the $2,9000,000 in warrants to First Data. *See id.* at ¶ 45.

Finally, Chalverus relies on the second quarter Form 10–Q issued on August 14, 1997 (signed by Vishner), which stated that:

> Software license revenue for the 1997 Three Month Period increased 131.9% to $9.0 million from $3.9 million for the 1996 Three Month Period. Software license revenue for the 1997 Six Month Period increased 141.8% to $15.5 million from $6.4 million for the 1996 Six Month Period. The increase in software license revenue was *primarily attributable to software license acceptance by new customers, software license agreement renewals*, and extended software usage by existing customers.

*Id.* at ¶ 49 (emphasis added). Similarly, the "Management's Discussion and Analysis" section of the Form 10–Q reported revenue of $12,2000,000, almost double the previous year's second quarter revenues, and stated that the increase was "primarily due to an increase in software license revenue." *Id.* at ¶ 48. Chalverus argues that these statements were materially false and misleading because "the increase in software license revenue in the second quarter was almost entirely due to the improper recognition of $5 million from the license to First Data described in the July 2 press release," *id.* at ¶ 50, and also for the same reasons that the July 29 press release was materially false and misleading, *see id.* at ¶¶ 45, 52.

As noted above, a securities fraud plaintiff must allege with particularity the who, what, when, where, and why of each materially false or misleading misrepresentation or omission. *See* 15 U.S.C. § 78u–4(b)(1); *Lirette*, 27 F.Supp.2d at 276. This Court concludes that Chalverus has satisfied this requirement. The Complaint sets forth the content of each statement alleged to be false or misleading, the name of the speaker, the date on which each statement was made, the document in which each statement was made public, and a detailed explanation of why each

statement was false. *See* Compl. ¶¶ 40, 45, 50, 52. Moreover, as this Court has noted, a securities fraud plaintiff adequately pleads financial fraud based on improper revenue recognition by alleging some particular transaction in which revenues were improperly recorded, the name of the customer, the terms of the specific transaction, when the transaction occurred, and the approximate amount of the fraudulent transaction. *See In re Peritus Software Servs., Inc. Sec. Litig.,* 52 F.Supp.2d 211, 222 (D.Mass. 1999); *Lirette,* 27 F.Supp.2d at 278. Chalverus has satisfied this requirement: according to the Complaint, Pegasystems improperly recognized $5 million in revenue from the June 27, 1997 Agreement with First Data, which required Pegasystems to pay $12.9 million to First Data. *See* Compl. ¶ 45.

To the extent Chalverus' allegations are based on "information and belief," 15 U.S.C. § 78u–4(b)(1), the Complaint "state[s] with particularity all facts on which that belief is formed," *id.* Specifically, Chalverus predicates his "information and belief" on:

- the October 29, 1997 press release in which Pegasystems indicated that it might restate its second quarter earnings, *see* Compl. ¶ 54;

- the November 6, 1997 Form 8–K, *see id.* at ¶¶ 58–59;

- the November 6, 1997 story reported by Bloomberg News Service, *see id.* at ¶ 60;

- the November 7, 1997 statement carried by the Dow Jones Newswire, *see id.* at ¶ 61;

- the November 18, 1997 press release in which Pegasystems announced its third quarter results and its restated second quarter results, *see id.* at ¶¶ 63–65;

- the November 19, 1997 Form 10–Q/A for the second quarter, *see id.* at ¶¶ 69–71;

- the November 19, 1997 Form 10–Q for the third quarter, *see id.* at ¶¶ 72–73;

- the April 15, 1998 Form 10–K for 1997, *see id.* at ¶¶ 74–77; and

- the April 2, 1998 press release reporting that Pegasystems planned to further restate its results for the second quarter of 1997, *see id.* at ¶¶ 78–79.

In *In re Peritus,* this Court concluded that a plaintiff may rely on the defendant's own disclosures about a revenue restatement to allege that previously-made statements about revenue were materially false or misleading. *See In re Peritus,* 1999 WL 362830, at *9. Because Chalverus bases his beliefs on Pegasystems' Securities and Exchange Commission filings and press releases that disclose the restatement of the second quarter results, this Court concludes that Chalverus' allegations are based on particularized facts, even to the extent he relies on "information and belief." *See id.; see also* 15 U.S.C. § 78u–4(b)(1).

*(b) Scienter*

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2) (emphasis added). *See In re Number Nine Tech. Corp. Sec. Litig.,* 51 F.Supp.2d 1, 13 (D.Mass. 1999). The required state of mind for claims under section 10(b) of the Exchange Act and Rule 10(b)–5 is the "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). A plaintiff fulfills the scienter requirement by showing that the defendant knowingly or recklessly committed fraud; he or she may not, however, predicate scienter on the defendant's negligence. *See Downey v. Vernitron Corp.,* 559 F.Supp. 1081, 1085 (D.Mass.1982) (Skinner, J.).

A defendant's failure to recognize revenue in accordance with GAAP does not, by itself, suffice to establish scienter.

*See, e.g., Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 362 (1st Cir. 1994). Thus, the fact that Pegasystems voluntarily restated its second quarter results does not, standing alone, support a "strong inference" that the company knowingly or recklessly misreported income in the second quarter of 1997. *See In re Peritus,* 1999 WL 362830, at *10. Rather, the Court must determine whether the alleged GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants acted with scienter. *See id.; In re Ancor Communications, Inc. Sec. Litig.,* 22 F.Supp.2d 999, 1005 (D.Minn.1998) (noting that "violations of GAAP, in combination with other factors, may support a strong inference of scienter.").

Chalverus contends that the following are circumstances indicative of fraudulent intent that, combined with the alleged GAAP violations, amount to a strong inference of scienter: (1) the magnitude of the overstatement of revenue and earnings; (2) the violation of Pegasystems' own internal policies for reporting revenue and earnings; (3) the omission in public statements of material facts related to the GAAP violations; (4) Pegasystems' dispute with Ernst & Young and the auditor's eventual resignation; and (5) Pegasystem's motives to overstate income.

### (1) *The Magnitude of the Overstatement*

■ Pegasystems restated its second quarter revenue from $12,200,000 to $4,700,000 and restated its earnings from a *gain* of $2.2 million to a *loss* of $2.8 million. *See* Compl. ¶¶ 63, 78. The total amount by which Pegasystems restated its revenue—$7,485,000—equals 158 percent of its actual revenue for that quarter.

Courts have held that significant overstatements of revenue "tend to support the conclusion that the defendants acted with scienter." *Marksman Partners v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1314 (C.D.Cal.1996). In *Rehm v. Eagle Fin.*

*Corp.,* 954 F.Supp. 1246, 1255 (N.D.Ill. 1997), alleged violations of GAAP required the defendant to restate annual earnings by ninety-one percent. The court concluded that "[t]he fact that these alleged accounting violations led to a drastic overstatement of Eagle's yearly earnings and that defendants were responsible for calculating and releasing the financial information tends to support the conclusion that the defendants acted with scienter." *Id.; accord In re Miller Indus., Inc. Sec. Litig.,* 12 F.Supp.2d 1323, 1332 (N.D.Ga.1998) (holding that dramatic overstatement of revenue, coupled with unusual insider trading, evidenced a strong inference of scienter).

Drastic overstatements of revenue are particularly suspect when the transaction occurs at a suspicious time, such as the end of a fiscal quarter or year. *See Van de Velde v. Coopers & Lybrand,* 899 F.Supp. 731, 735–36 (D.Mass.1995) (Saris, J.) (plaintiff adequately pled scienter for section 10[b] claim by alleging inter alia that defendants improperly recognized substantial revenue three days before the end of the fiscal year). In the instant case, Pegasystems entered into the First Data Agreement on June 27, 1997. *See* Compl. ¶ 33. It recognized the revenue from the Agreement in its second quarter, which closed just three days later on June 30, 1997.

### (2) *Violation of Pegasystems' Internal Policy*

Chalverus also contends that Pegasystems' violation of its internal revenue recognition policy evidences knowing or reckless behavior. According to the prospectus, "revenue from software licenses is recognized upon product acceptance" and when "the Company has no significant vendor obligations." Compl. ¶ 28. Chalverus maintains that Pegasystems' accelerated recognition of revenue from the First Data agreement violated this internal policy because Pegasystems was obligated to help First Data incorporate

Pegasystems' software into First Data's applications. *See* Pl. Opp. Mem. at 31.

Courts have held that violation of a company's own policy supports an inference of scienter. *See Provenz. v. Miller*, 102 F.3d 1478, 1490 (9th Cir.1996) (denying summary judgment on the scienter issue because the defendant allegedly violated GAAP and its own revenue recognition policies); *cf. Van de Velde*, 899 F.Supp. at 735 (accounting firm acted knowingly or recklessly when it ignored the fact that its client recognized revenue in violation of its internal policy).

### (3) *Omissions in Public Statements*

Chalverus further argues that Pegasystems' failure to disclose its $12,900,000 obligation to First Data in the July 2, 1997 press release, which reported the Agreement and its expected $50,000,000 value, *see* Compl. ¶¶ 38–40, implies that Pegasystems acted with the requisite scienter.

In *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir.1994), the defendants made public statements about revenues without disclosing the company's generous return policy. The court noted that while GAAP violations do not by themselves constitute circumstantial evidence of scienter, the GAAP violations combined with the omission of the return policy in the public statements was "more than sufficient to support a fact-finder's inference that [the defendants] intended to deceive, manipulate, or defraud investors." *Id.; accord In re Digi Int'l, Inc. Sec. Litig.*, 6 F.Supp.2d 1089, 1098 (D.Minn.1998) (plaintiffs adequately pled scienter under the PSLRA by alleging violations of GAAP and "other related omissions of material facts" in public statements regarding the defendant's acquisition of a developmental company); *Rehm*, 954 F.Supp. at 1255–56 (GAAP violations combined with other allegedly misleading statements were sufficient evidence of scienter under PSLRA).

Of course, Chalverus must also allege that Pegasystems knew about the $12,900,-000 debt to First Data when it issued the July 2 press release. *See Lirette*, 27 F.Supp.2d at 283. As matter of law, however, courts have held that certain information, particularly "facts critical to ... an important transaction[,] generally are so apparent that their knowledge may be attributed to the company and its key officers." *Epstein v. Itron, Inc.*, 993 F.Supp. 1314, 1326 (E.D.Wash.1998); *accord In re Ancor Communications*, 22 F.Supp.2d at 1005 (holding that knowledge of facts related to the defendant's $30 million contract could be imputed to the company and its officers and that such knowledge evidenced a strong inference of scienter). Trefler himself called the First Data Agreement "an exceptional opportunity," and placed its value at $50,000,000 over five and a half years. Compl. ¶ 38. In fact, Pegasystems has not argued that Trefler and Vishner were unaware of the $12,900,000 obligation to First Data.

### (4) *The Disagreement with Ernst & Young and Ernst & Young's Resignation*

Chalverus further asserts that Pegasystems' dispute with Ernst & Young and the auditor's subsequent resignation imply an intent to defraud. GAAP, however, is not "a canonical set of rules that will ensure identical accounting treatment of identical transactions." *Thor Power. Tool Co. v. Commissioner*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). Rather, it "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Id.; accord In re I.C.H. Corp.*, No. 397CV2385–G, 1998 WL 386165, at *5 (N.D.Tex. July 8, 1998) (noting that the company's disagreement with its auditor and subsequent decision to seek a second opinion did not establish scienter).

Ernst & Young's resignation also fails to imply scienter. "[T]he fact that Defendants changed auditors because of a difference in judgment about generally accepted accounting principles does not establish

conscious behavior on the part of Defendants." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1021 (5th Cir.1996) (dismissing securities fraud action under Rule 9[b]).

While it is disturbing that Pegasystems blames Ernst & Young for advice that the auditor says it never gave, *see* Compl. ¶¶ 59, 66, the fact that Pegasystems wants to shift the blame for the overstatement does not support an inference that Pegasystems knowingly or recklessly, rather than negligently, violated GAAP. "Negligence is not to be admired, but it is insufficient for Section 10(b) purposes." *Wells v. Monarch Capital Corp.*, 129 F.3d 1253 (1st Cir.1997) (table), 1997 WL 693032, at *5.

### (5) *Motives to Commit Fraud*

Finally, Chalverus argues that Pegasystems' motive to commit fraud provides additional support for the strong inference of scienter. Specifically, Chalverus contends that Pegasystems was motivated to overstate revenue and income in order to make the second quarter of 1997 its fiftieth consecutive profitable quarter. *See* Compl. ¶¶ 41, 45(b). As Vishner told Bloomberg News Service on November 6, 1997, it was "a big deal for us—not to make profits." *Id.* at ¶ 60. In addition, Pegasystems' line of credit had profitability requirements. *See id.* at ¶ 84(i). Moreover, the officers—including Vishner and Trefler had a motive keep stock prices high because their compensation packages included stock and stock options. *See id.* at ¶¶ 85–89.

Although evidence of motive and opportunity is "insufficient" to support a strong inference of scienter under the PSLRA, *see In re Number Nine*, 1999 WL 362789, at *24, it is not wholly irrelevant to the scienter inquiry, *see In re Baesa Sec. Litig.*, 969 F.Supp. 238, 242 (S.D.N.Y.1997) ("This, of course, does not mean that particulars regarding motive and opportunity may not be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred."). Accordingly, this Court gives some consideration to the allegations that Vishner and Trefler had personal motives for committing securities fraud.

The Court concludes that Chalverus' allegations regarding (1) the violation of GAAP, (2) the magnitude of the overstatement, (3) the violation of an internal corporate policy, (4) the omission of the $12,9000,000 obligation to First Data in the July 2, 1997 press release, and (5) Trefler and Visher's motives to commit fraud—taken together—satisfy the PSLRA's "strong inference" requirement. As this Court stated in *In re Peritus*, 1999 WL 362830, at *10, "GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants knowingly or recklessly misled investors." In this case, the Complaint sets forth such "other circumstances" with sufficient detail to meet the PSLRA standard. *See In re Ancor Communications*, 22 F.Supp.2d at 1005 (failure to disclose information material to a $30,000,000 contract combined with GAAP violations amounts to a strong inference of scienter); *Rehm*, 954 F.Supp. at 1255 (allegations of GAAP violations resulting in overstatement of revenue by ninety-one percent satisfies scienter requirement under PSLRA). Accordingly, this Court DENIES the motion to dismiss the Complaint for failure to plead violations of section 10(b) and Rule 10b–5 in accordance with Rule 9(b) and the PSLRA.

### 2. *Section 20(a)*

Chalverus also asserts claims against Vishner and Trefler under section 20(a) of the Exchange Act. Section 20(a) provides that any person who "controls" someone who violates the Exchange Act is liable for the violation. *See* 15 U.S.C. § 78t(a). To the extent that a plaintiff sets forth a primary violation of the Exchange Act, dismissal of a section 20(a) claim for derivative liability is inappropriate. *See In re Fidelity/Micron Sec. Litig.*, 964 F.Supp. 539, 548–49 (D.Mass.1997) (Stearns, J.). Moreover, a court should

deny a motion to dismiss a section 20(a) claim when the defendants themselves made the allegedly false and misleading statements. *See In re PLC Sys.*, 41 F.Supp.2d at 122.

In this case, Trefler made the allegedly false statements in the July 2 and July 29 press releases, *see* Compl. ¶¶ 38, 43, and Vishner signed the Form 10–Q for the second quarter of 1997, *see id.* at ¶ 47. Accordingly, this Court DENIES the motion to dismiss the section 20(a) claims against Vishner and Trefler. *See In re PLC Sys.*, 41 F.Supp.2d at 122.

## CONCLUSION

For the foregoing reasons, this Court DENIES the motion to dismiss the Complaint (Docket No. 25).