## In re SEGUE SOFTWARE, INC. SECURITIES LITIGATION

### No. CIV.A. 99–10891–RGS.

United States District Court, D. Massachusetts.

July 26, 2000.

Jeffrey C. Block, Berman, DeValerio & Pease, Boston, MA, Steven Schulman, Milberg, Weiss, Bershad Specthrie & Lerach, Lester L. Levy, Wolf, Popper, Ross, Wolf & Jones, New York, NY, Thomas G. Shapiro, Shapiro, Haber & Urmy LLP, Stephen Moulton, Moulton & Gans, LLP, Boston, MA, Richard D. Kranich, Law Office of Richard D. Kranich, New York, NY, for Nathan Rice, Plaintiffs.

Jeremy M. Sternberg, Jeffrey A. Simes, Goodwin, Procter & Hoar, Stephen D. Poss, Goodwin, Procter & Hoar, Boston, MA, for Segue Software, Inc., Steven Butler, Carl Blandino, Defendants.

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

STEARNS, District Judge.

This class action was brought on behalf of investors who purchased Segue Software, Inc. (Segue) common stock between July 14, 1998, and April 9, 1999. The lawsuit alleges that the price of Segue shares was artificially inflated by an accounting practice that violated generally accepted accounting principles (GAAP). Segue now moves to dismiss the Consolidated Amended Class Action Complaint (Amended Complaint).

## BACKGROUND

The well-pleaded facts alleged in the Amended Complaint are for present purposes deemed to be true.[1] Segue is a Delaware corporation with its principal place of business in Lexington, Massachusetts. Segue supplies supporting software for "e-commerce" applications. Defendant Stephen Butler is President, Chief Executive Officer and a director of Segue. Defendant Carl Blandino is Segue's Chief Financial Officer and Senior Vice President of Administration.[2] "Blandino's primary responsibilities include managing [Segue's] financial reporting, as well as establishing relationships with the investment community." Amended Complaint ¶ 10.

As a regulated issuer, Segue files periodic public reports with the SEC and the National Association of Securities Dealers (NASD). Segue's SEC Form 10–K for the 1997 fiscal year, filed on March 31, 1998, disclosed: (1) that Segue recognized revenue from license fees upon receipt of a signed purchase order or contract; (2) that when revenue was recognized from the sale of software, collection was probable, no significant vendor obligations remained, and the costs of support obligations, if any, were accrued; (3) that customers were not ordinarily given a contractual right to return software purchases but that "the Company has accepted returns of certain software products and has provided an allowance for those specific products"; (4) that returns were carried as a charge to general and administrative expenses; and (5) that Segue had established a reserve to offset estimated returns. Simes Aff., Ex. A, at 30. The Form 10–K also stated that "[i]n October 1997, Statement of Position 97–2, 'Software Revenue Recognition'

(SOP 97–2), was issued which provides guidance on applying GAAP in recognizing revenue on software transactions entered into in fiscal years beginning after December 15, 1997. The Company will adopt the guidelines of SOP 97–2 as of January 1, 1998 and does not expect adoption to have a material impact on the Company's financial results."[3] Id., at 18.

## DEFENDANTS' ALLEGED FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

At the hearing on defendants' motion to dismiss, plaintiffs' counsel represented that two Segue press releases (July 14, 1998, and February 9, 1999), and Segue's third and fourth quarter 1998 SEC Form 10–Q filings (November 13, 1998, and February 9, 1999) form the basis of the plaintiffs' claims.

### July 14, 1998 Press Release: Business Wire

On July 14, 1998, Segue announced over *Business Wire* that Universal Underwriters Group (UUG) had "recently made a several million dollar and multi-year commitment to Segue for implementing LiveQuality Millennium [one of Segue's trademark products introduced to market in the second quarter of 1998] for a corporate-wide effort to ensure the quality and reliability of their Year 2000 ('Y2K') systems." Amended Complaint ¶ 29. The following week, Segue's stock price rose from $15.875 to $19.25 per share, an increase of 21.3%. Id. ¶ 30. Plaintiffs allege that this statement was false and misleading because it omitted the fact that UUG's commitment was "wholly contingent on

1. The Amended Complaint is framed on sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Securities and Exchange Commission (SEC) Rule 10b–5 (17 C.F.R. § 240.10b–5).

2. Blandino resigned from Segue after the Amended Complaint was filed.

3. The Form 10–K also cautioned investors that Segue's technology business was "intensely competitive" and that significant quarterly fluctuations in revenues and operating results would likely have a corresponding impact on the price of its shares. Simes Aff., Ex. A, at 8, 23.

UUG's satisfaction with the Company's product." UUG ultimately returned "hundreds of thousands of dollars worth" of Segue software. Id. ¶ 31.

*November 13, 1998 Third Quarter SEC Form 10–Q*

On November 13, 1998, Segue filed its Form 10–Q for the third quarter ending September 30, 1998, reporting "stunning increases in software revenue." Id. ¶ 47.

> Software revenue increased 90% to $6.5 million during the third quarter of 1998 from $3.4 million in the third quarter of 1997. For the nine months ended September 30, 1998, software revenue increased 61% to $18.2 million from $11.3 million for the nine months ended September 30, 1997. The increases in software revenue are primarily the result of increased unit shipments due to an increase in the demand for automated testing products; the introduction of new and upgraded products; increased market acceptance of the families of products including Web application testing and load testing products introduced in 1997; and expansion of sales and marketing activities. The absolute dollar increase in software revenue came largely through the direct domestic channel.

Id.[4] Plaintiffs allege that these statements regarding Segue's earnings were false and misleading because they failed to disclose the recognition of revenue derived from sales contingent on customers' right of return or exchange, resulting in the overstatement of operating profits for the quarter by 3 cents per share (10 cents per share instead of 7 cents). Id. ¶ 50. Plaintiffs also maintain that the assertion that Segue's financial statements had been prepared "pursuant to the rules and regulations of the Securities and Exchange Com-

mission" was misleading because the statements did not in fact conform with GAAP. Id. ¶ 49.

*February 9, 1999 Fourth Quarter SEC Form 10–Q*

On February 9, 1999, Segue filed its Form 10–Q for the fourth quarter of 1998, reporting consolidated quarterly revenues of $12 million (a 67 percent increase over the previous year), and a pro forma operating loss of 2 cents per share. Segue also reported a pro forma profit of $309,000, or 3 cents per share, for the year ending 1998, compared to a previous year's loss of $1.7 million, or 21 cents a share. Plaintiffs allege that the 10–Q filing was materially false and misleading because it failed to disclose an actual fourth quarter loss of $607,000 (as opposed to the reported loss of $175,000) and a true operating loss of 10 cents per share. Id. ¶ 71.

*February 9, 1999 Press Release*

Commenting on Segue's fourth quarter 1998 earnings, Butler said the following about Segue's "channel sales" organization.[5]

> We are pleased with the continuing strength of our e-business management products, which grew to 59% of product revenue. However, we do not believe we have reached our full potential in the fourth quarter ... In the fourth quarter, with the signing of channel partner agreements with IONA Technologies, Netscape Communications and Arthur Andersen, we accelerated the investment in our channel organization by adding territory channel staff, increased outsourcing to new system integrators and accelerated joint marketing efforts with our new and existing partners, however, the corresponding revenue

---

4. SEC Regulation S–4 (17 C.F.R. § 210.10–01(a)) requires, with limited exceptions, that interim financial statements follow a prescribed format. A related SEC regulation (17 C.F.R. § 210.4–01(a)(1)) states that filings that do not conform with GAAP are presumed misleading or inaccurate.

5. "Channel sales" referred to the marketing of products and services directly to Segue's business partners.

growth did not materialize as rapidly as we had expected.... While channel investments lowered our net margins in the fourth quarter, it has enabled Segue to broaden our reach with marquis system integrators, consulting partners and resellers to capitalize on this booming e-business market and channel revenue opportunities anticipated in 1999.

Id. ¶ 69.

Plaintiffs allege that Butler's statements implying an increased commitment to the channel sales organization were contradicted by management plans to reduce the channel sales force. Id. ¶ 68. Following Butler's comments, the price of Segue's common stock dropped from $15.9375 to $11 a share, a one day loss of $4.9375 a share, or approximately 31%. Id. ¶ 70.

*The Restatement of Revenues*

On April 12, 1999, Segue announced a downward revision of its third and fourth quarter 1998 earnings because of certain sales practices "that did not comply with the Company's policies." Segue reduced its third quarter 1998 software revenues of $6,512,000 by $363,000, and its fourth quarter revenues of $12 million by $745,000. The net impact was to reduce Segue's 1998 revenues of $41 million by $1.1 million, or 2.6 percent, converting an operating profit of 3 cents per share into an 8 cents per share loss. Id. ¶ 83.[6] During the week following the restatement, the price of Segue shares rose from $5.50 to $6.313. Segue Reply, Ex. 4, at 7.

*LEGAL STANDARDS*

When considering a motion to dismiss, "[w]e must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss." *Vartanian v. Monsanto Company,* 14 F.3d 697, 700 (1st Cir.1994). The complaint

must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain a recovery under some actionable theory." *Glassman v. Computervision Corp.,* 90 F.3d 617, 628 (1st Cir.1996), quoting *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir.1988). The court may disregard unsupported assertions and bare legal conclusions in its analysis. See *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1216 (1st Cir.1996). However, the court must indulge "every reasonable inference helpful to [plaintiffs'] case." *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 360–361 (1st Cir.1994).

Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Where securities fraud is alleged, the particularity requirement is even more stringent.

[G]eneral averments of the defendants' knowledge of material falsity [of disclosures] will not suffice. Consistent with Fed.R.Civ.P. 9(b), the complaint must set forth specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading. The rule requires that the particular times, dates, places or other details of the alleged fraudulent involvement of the actors be alleged.

*Serabian,* 24 F.3d at 361 (citations and internal quotation marks omitted). The particularity requirement is intended to discourage so-called "strike suits" seeking, in effect, to force extortionate settlements from companies embarrassed or burdened by the prospect of defending litigation colored by allegations of fraud. *Suna v. Bailey Corp.,* 107 F.3d 64, 73 (1st Cir.1997). The 1995 Private Securities Litigation Reform Act (PSLRA) has a similar purpose, requiring that plaintiffs in securities lawsuits "state with particularity facts giving

6. The revision also included a write-off of a nonrecurring charge of $667,000, resulting from a decision by management to terminate an underperforming reseller's agreement with Sun Microsystems. Id. ¶ 84.

rise to a *strong* inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). While the PSLRA does not bar plaintiffs from proceeding on a theory of "scienter by 'recklessness,' they still must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado v. Dominguez*, 137 F.3d 1, 9 n. 4 (1st Cir.1998).[7]

■ To state a cause of action under section 10(b) and Rule 10b–5, a plaintiff must plead scienter, a material omission or misrepresentation, and detrimental reliance causing injury, all in connection with the purchase or sale of a security.[8] *Holmes v. Bateson*, 583 F.2d 542, 551 (1st Cir.1978).

### Scienter

■ "Scienter" describes a mental state "embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). To show scienter, plaintiffs must plead specific allegations of fact giving rise to a "strong inference" that defendants said one thing while believing or knowing another. 15 U.S.C. § 78u–4(b)(2); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 201 (1st Cir.1999). A showing of negligence or "mere recklessness" does not suffice. *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 976

(9th Cir.1999). Rather, plaintiffs must show a deviation from ordinary standards of care so extreme as to support a "strong" inference that defendants were aware of the misleading nature of their conduct or so blatant that the capacity of their actions to mislead would have been obvious to any reasonable actor. Plaintiffs must do this by setting forth "specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading. The rule requires that the particular times, dates, places or other details of the alleged fraudulent involvement of the actors be alleged." *Serabian*, 24 F.3d at 361.

### Material Misrepresentation

■ A company will be found liable under Rule 10b–5 only where it has affirmatively misled investors into purchasing its stock by publishing materially false or incomplete information. See *Central Bank v. First Interstate Bank*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Shaw*, 82 F.3d at 1202; *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.1990) (en banc); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26 (1st Cir. 1987). The law does not impose a duty on a publicly-traded company to disclose non-public information. *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). But

---

**7.** While recognizing that Congress, in enacting the PSLRA, intended to curb perceived abuses by the plaintiffs' securities bar, the First Circuit did not perceive the "new standard to differ from [the rigorous standard] which this court has historically applied." Id., 137 F.3d at 9 n. 5, citing *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992).

**8.** Section 10(b) prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 provides that: [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or

of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1987).

when a corporation does make a disclosure —— whether it be voluntary or required —— there is a duty to make it complete and accurate. This, however, does not mean that by revealing one fact about a product, one must reveal all others, that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be "so incomplete as to mislead."

*Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996) (citations omitted). "Whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact." *Fecht v. The Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). "Only if reasonable minds could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

*Reliance*

■ While plaintiffs perfunctorily plead direct reliance on the four disputed statements in making their decision to buy (or hold) Segue stock, it is clear from the main brief that "fraud-on-the-market" is their preferred theory. See, e.g., Plaintiffs' Memorandum, at 3 n.4. A viable section 10(b) fraud-on-the-market claim can be plead without alleging specific reliance. See *In re Fidelity/Micron Securities Litigation*, 964 F.Supp. 539, 546 (D.Mass. 1997). The theory underlying this type of claim assumes that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants'

fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 241–242, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–1161 (3d Cir.1986). In a fraud-on-the-market case

the statements identified by plaintiffs as actionably misleading are alleged to have caused injury, if at all, not through the plaintiffs' direct reliance upon them, but by dint of the statements' inflating effect on the market price of the security purchased. When the truth is disclosed and the market self-corrects, investors who bought at the inflated price suffer losses. Those losses can be deemed to have been caused by the defendants' statements, even absent direct reliance by plaintiffs, because the statements were presumptively absorbed into and reflected by the security's price.

*Shaw*, 82 F.3d at 1218 (internal citations omitted).

## DISCUSSION

The essence of plaintiffs' claim is that the defendants deliberately inflated the price of Segue's common stock by improperly booking contingent sales to boost third and fourth quarter 1998 revenues.[9] Id., at 2. The motive, according to plaintiffs, was to meet or exceed market analysts' expectations in order to enhance performance bonuses and the value of the defendants' personal holdings in Segue. Amended Complaint ¶¶ 117, 118, 120, 124 and 125.[10] "The precise amounts of income added to Segue's financial statements through improper accounting were just enough to change (i) earnings disappointments into numbers that exceeded analysts' expectations; and (ii) a loss for

---

**9.** Plaintiffs state that the "most compelling evidence of defendants' scienter" derives from Segue's accounting improprieties. Plaintiffs' Memorandum, at 4.

**10.** Plaintiffs also allege that management saw inflated Segue stock as a cheap currency for use in the company's acquisition strategy. Id. ¶ 124; Plaintiffs' Memorandum, at 39–40.

the year into a profit." Plaintiffs' Memorandum, at 5.

Plaintiffs point to the fact that on July 14, 1998 (the day that Segue announced the UUG deal), BT Alex. Brown [11] issued a "buy" recommendation, noting that in landing UUG, "the Company booked 4 LiveQuality orders. Each one exceeded $250K in size." Amended Complaint ¶ 34. According to plaintiffs, the analysts following Segue had a similarly favorable response to Segue's third quarter 1998 earnings announcement. On October 13, 1998, Van Kasper & Company reported that "Segue continued its year long turnaround, reporting Q3 numbers that beat our top-line estimate by 6% ($10.2 mm vs. 9.6 mm) and met our fully taxed $0.07 EPS estimate (the company reported $0.10 EPS with a 6% tax rate)." Id. ¶ 41. Van Kasper consequently reaffirmed its "buy" recommendation for Segue stock. That same day, Adams Harkness rated Segue stock as "attractive" in light of the third quarter results, which were "in line with Street expectations and a penny ahead of our $0.06 fully taxed estimate." Id. On October 14, 1998, analysts at BT Alex. Brown made similarly favorable comments. Id.[12]

■ The only allegedly fraudulent "customer satisfaction" transaction that plaintiffs identify with any degree of specificity is the agreement by UUG to purchase Segue's LiveQuality Millennium software product.[13] The discussion, however, fails to specify how plaintiffs were materially misled by anything said (or left unsaid) by Segue's announcement of the deal.[14] While it is true that Segue did not specifically state that the UUG contract contained a right of return clause, the relevant Form 10–K made no secret of the fact that the company selectively permitted returns.

> The Company typically does not grant to its customers a contractual right to return software products. When approved by management, however, the Company has accepted returns of certain software products and has provided an allowance for those specific products. The Company also provides reserves for customer receivable balances which are considered potentially uncollectible. The Company's allowances amounted to $345,000, $200,000 and $150,000 as of December 31, 1997, 1996 and 1995 respectively. The provision charged to general and administrative expenses was $362,000, $489,000 and $249,000 in 1997, 1996 and 1995, respectively, and write-offs against allowances were $217,000, $439,000 and $139,000 in 1997, 1996 and 1995, respectively.

Simes Aff., at Ex. A, at 30.

■ Plaintiffs, however, contend that with respect to customer returns, Segue's accounting practices deviated from GAAP, specifically SOP 97–2 and Statement of Financial Accounting Standards No. 48

**11.** BT Alex. Brown was one of the lead underwriters for Segue's 1996 initial public offering of its common stock.

**12.** Absent some showing of willful manipulation of the analysts by Segue's management, these statements cannot be attributed to the defendants. *Suna,* 107 F.3d at 73–74; *Raab v. General Physics Corp.,* 4 F.3d 286, 288–289 (4th Cir.1993); *Haft v. Eastland Financial Corp.,* 772 F.Supp. 1315, 1319 (D.R.I.1991). No facts even insinuating deceitful conduct by Segue in its dealings with the analysts are plead. Indeed, as defendants point out, "[n]ot one single statement by any defendant to any analyst is identified anywhere in the lengthy Amended Complaint or [plaintiffs' briefings]." Defendants' Reply, at 11.

**13.** The Amended Complaint makes reference to conditional sales to Netscape and the United States Military. Id. ¶ 105. The Amended Complaint, however, does not specify the dates of the sales, the number of sales, the amounts involved, whether any items were returned, the return amount, how Segue handled the accounting adjustment, or the identities of any Segue personnel involved. See *Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 278 (D.Mass.1998).

**14.** The most specific allegation is the claim that returns on UUG purchases "caused" the $745,000 fourth quarter 1998 revision in earnings. Amended Complaint ¶ 85.

(FAS 48). As explained in *Greebel*, FAS 48 does not prohibit a seller from recognizing contingent sales income so long as certain conditions are met, the most important of which require a reasonable estimate of expected returns and the set-aside of a sufficient reserve to absorb any resulting reversal of revenue. 194 F.3d at 203. Estimating returns, as the rule makers recognize, entails a degree of unavoidable guesswork.

The ability to make a reasonable estimate of the amount of future returns depends on many factors and circumstances that will vary from one case to the next. However, the following factors may impair the ability to make a reasonable estimate:

a. The susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand.

b. Relatively long periods in which a particular product may be returned.

c. Absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances, for example, changes in the enterprise's marketing policies or relationships with customers.

d. Absence of a large volume of relatively homogeneous transactions.

FAS 48 ¶ 8.

What is evident from the pleadings is that Segue's historical estimates of expected returns had been remarkably accurate and, during the three years preceding 1998, were well within the allocated reserves. *Greebel*, 194 F.3d at 206.[15] Plaintiffs nonetheless ask the court to infer that Segue's 1998 estimate was deliberately understated and the reserve consequently inadequate, causing the April 1998 restatement.[16] A fatal deficiency in the pleadings in this regard, however, lies in plaintiffs' failure to allege any facts suggesting that the 1998 estimate was abnormally low in comparison to earlier years, or that a material change in Segue's customer base made it unreasonable to rely on historical experience. In fact, the estimate was substantially higher ($608,000) than in any of the three preceding years, which by itself tends to negate any inference of fraudulent intent.[17]

While what in hindsight proved to be an underestimate of returns and a correspondingly insufficient allowance for income reversals forced Segue to restate its 1998 operating results (producing a small loss per share instead of a small profit), a restatement of earnings, without more, does not support a "strong inference" of fraud, or for that matter, a weak one. See *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 967 (7th Cir.1989). See also *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 234 (D.Mass.1999) ("[T]he fact that [the defendant] voluntarily restated its second quarter results does not, standing alone, support a 'strong inference' that the company knowingly or recklessly misreported income"); *Reisman v. KPMG Peat Marwick LLP*, 965 F.Supp. 165, 173 n. 11 (D.Mass.1997) (a restatement of revenues for the years 1991 through 1993 was insufficient by itself to demonstrate that

15. Plaintiffs do argue that a shift occurred in 1998 in Segue's core business strategy. Amended Complaint ¶ 100. They do not explain, however, why this shift would have impacted the return rate.

16. Plaintiffs insist in their brief that "this case does not concern the sufficiency of the allowance." Plaintiffs' Memorandum, at 12. This statement is contradicted by numerous others in the same brief. See, e.g., id., at 2, 9.

17. The closest plaintiffs come to an explanation is the suggestion that Butler and Blandi-

no stood to personally benefit from the alleged scheme, and, as newcomers to the company brought in to oversee a shift in business focus and strategy, were under pressure to show results. Plaintiffs' Memorandum, at 36–39, 41–42. Butler, however, did not join Segue until late 1997, and the Amended Complaint is silent on his role in formulating the 1998 estimate. Blandino did not join the company until July of 1998, and thus could not have had any role at all.

the original statements were knowingly false when made). To reflexively punish a company for correcting its earning statements when subsequent events disclose errors in the originals would create a perverse incentive for management to conceal mistakes, thereby defeating a core purpose of the securities laws. Here, the candid and prompt manner in which Segue's management responded to the reversal of revenues negates rather than supports any inference of scienter.[18]

■ Plaintiffs complain that even if the reserve established by Segue for returns was reasonable under the circumstances, it was misclassified as a "general and administrative expense" rather than as an adjustment to sales revenues. "This is significant because any component of the allowance relating to sales with a right of return was required pursuant to ... FAS 48 to be classified in the income statement as a reduction of the sales revenue line item, **not as a general and administrative expense**." Plaintiffs' Memorandum, at 10 (emphasis in original). As an accounting issue, plaintiffs may well have the better of the argument, but *Greebel* teaches that " '[g]enerally accepted accounting principles, ... tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.' " *Greebel*, 194 F.3d at 205, quoting *Thor Power Tool Co. v. Commissioner of Internal Revenue*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). Accounting judgments, even imperfect ones that violate GAAP, do not, absent "other circumstances," support an

inference of scienter. See *Greebel*, 194 F.3d at 205; *Reisman*, 965 F.Supp. at 172.[19] Cf. *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 283 (3d Cir.1992) ("[I]t is not a violation of the securities laws to simply fail to provide adequate loan loss reserves; properly collateralize or secure a loan portfolio; or provide sufficient internal controls or management practices"). The "other circumstances" that plaintiffs point to have a certain circularity in their logic, that is, they consist for the most part of the very practices that plaintiffs allege cumulatively violated GAAP. See Plaintiffs' Memorandum, at 18.[20]

More fundamentally, even if Segue's failure to conform strictly to GAAP transgressed the boundary of permissible choice, plaintiffs face a materiality problem, that is, they must show that any overstatement of earnings (coupled with other wrongs) was significant to their decision to purchase Segue stock (or to its valuation by the market). Minor adjustments in a company's gross revenues are not, as a rule, deemed material by either accountants or the securities law. See *Greebel*, 194 F.3d at 206 (an improper recognition of 4.2 percent of revenues did not support an inference of scienter); *Glassman*, 90 F.3d at 633 (a 3 to 9 percent misstatement of revenues was not material for purposes of Rule 10b–5). Cf. *Pegasystems*, 59 F.Supp.2d at 234 ("Courts have held that *significant* overstatements of revenue 'tend to support the conclusion that the defendants acted with scienter' ")

---

**18.** Plaintiffs' suggestion that the defendants may have chosen to postpone the day of reckoning in the hopes that fortune might smile in the interval is unsubstantiated speculation.

**19.** Segue's decision to write off engineering and license fees and prepaid royalties after deciding to terminate the reseller agreement with Sun Microsystems in the first quarter of 1999 rather than in the fourth quarter of 1998, even though later reversed by the company's outside auditors, clearly falls into this category, if it is a GAAP violation at all. As plaintiffs concede, a sale was made under the

agreement in the 1998 fourth quarter, giving rise to an inference that the agreement was a performing asset and reasonably considered as such until the customer returned the product in the first quarter of 1999.

**20.** There is the dark allegation that "Butler, himself, entered into secret agreements in order to circumvent GAAP." Plaintiffs' Memorandum, at 18. As best as can be determined from the pleadings, these "clandestine side agreements" appear to be the same contracts with return clauses that are said to underlie the violation of GAAP. Id., at 21–22.

(emphasis added).[21] As in *Greebel,* the overstatement of Segue's revenues was insignificant ($1.1 million or 2.6% of Segue's $41 million in sales in 1998) and nonsystemic (involving only ten sales out of hundreds consummated during the two final quarters of 1998).

Nonetheless, plaintiffs argue that, while the gross numbers were small, timing was everything. Segue recognized enough contingent revenue to turn a "disappointment" into an earnings figure meeting market expectations.[22] Plaintiffs' Memorandum, at 5. This may be true, but why is it significant? What made the third and fourth quarter 1998 results so important to investors, as opposed to any other quarter, particularly when, in the wake of the "rosy" quarterly reports and glowing analysts' predictions, the price of Segue's stock generally dropped ? See *In re Fidelity,* 986 F.Supp. at 48. The Amended Complaint sheds little, if any, light on defendants' motive in supposedly manipulating the 1998 earnings. The conclusory allegations that the defendants stood to personally benefit from the inflation of Segue's revenues and "had the opportunity to commit fraud" do little to advance matters. See *Greebel,* 194 F.3d at 197 ("We caution that the 'catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are not sufficient' "). The Amended Complaint does not allege that the individual defendants engaged in any suspicious sales of Segue stock timed to coincide with the company's disputed announcements.[23] Also, the suggestion that scienter can be inferred from the fact that Butler had been named once before as a defendant in a securities lawsuit, or that Blandino had once worked for a company accused of accounting irregularities, borders on calumny.

Finally, plaintiffs have failed to allege facts supporting the claim that Butler's February 9, 1999 statement (regarding investment in the channel sales organization) was untrue. Plaintiffs contend that delays in sales seminars and training and "hints" from Alex Levi (Segue's Senior Vice President of International Operations) at an internal sales meeting (that Butler attended) "of less than full support for the Company's 'Channel' sales" bear out their contention. Amended Complaint ¶ 68. But the Amended Complaint is hazy on details. What training and sales seminars were cancelled? What is the evidence that training sessions were cancelled because of Segue's lack of commitment to channel sales? Did Segue actually make a corporate decision to pull back on channel sales? What did Levi actually say? And if Butler's statement was so market-positive, why did the price of Segue shares drop nearly $5 a share the next day? [24]

*Personal Liability*

Count II of the Amended Complaint alleges violations of section 20(a) of the Securities Exchange Act. Section 20(a) authorizes a cause of action against any individual who exerts direct or indirect control over a corporation that acts in violation of the securities laws. Plaintiffs allege that defendants Butler and Blandino, as officers and directors of Segue exercised their power over Segue to cause it to engage in securities violations. The Amended Complaint alleges that Butler

---

21. In *Pegasystems,* the restatement led to a 158% downward adjustment in revenues. 59 F.Supp.2d. at 234.

22. At oral argument, plaintiffs' counsel analogized the consequence of the accounting manipulation as "making the point spread" in wagering on a sporting event.

23. In fact, there is no allegation that defendants sold any shares at all.

24. This is not to say that as a general proposition, I accept defendants' argument that the decline in the price of Segue stock over the class period is conclusive proof that no fraud occurred. A decline in price might only establish that a scheme was badly executed, or that, but for the scheme, the drop in share price would have been more precipitous than it was. A fraud need not succeed to be actionable.

and Blandino "signed and/or participated in the dissemination of the Company's filings, reports and press releases alleged herein to be misleading and had the ability and opportunity to prevent their issuance or cause them to be corrected." Amended Complaint ¶ 16. But where there is no 10(b)5 violation there is no section 20(a) liability, no matter how many documents a defendant signed. *Suna,* 107 F.3d at 72–73.

### ORDER

For the foregoing reasons, defendants' motion to dismiss the Amended Complaint is *ALLOWED.* The dismissal will be entered with prejudice.

SO ORDERED.